# ROVIARO *v.* UNITED STATES.

No. 58.   Argued December 11, 1956.—Decided March 25, 1957.

54

*Maurice J. Walsh* argued the cause and filed a brief for petitioner.

*James W. Knapp* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Olney, Beatrice Rosenberg* and *Julia P. Cooper.*

MR. JUSTICE BURTON delivered the opinion of the Court.

This case concerns a conviction for violation of the Narcotic Drugs Import and Export Act, as amended.[1]

---

[1] "(c) Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be fined not more than $2,000 and imprisoned not less than two or more than five years. . . .

"Whenever on trial for a violation of this subdivision [§ 2 (c)] the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury." 65 Stat. 767, 768, 21 U. S. C. § 174.

The principal issue is whether the United States District Court committed reversible error when it allowed the Government to refuse to disclose the identity of an undercover employee who had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged. For the reasons hereafter stated, we hold that, under the circumstances here present, this was reversible error.

In 1955, in the Northern District of Illinois, petitioner, Albert Roviaro, was indicted on two counts by a federal grand jury. The first count charged that on August 12, 1954, at Chicago, Illinois, he sold heroin to one "John Doe" in violation of 26 U. S. C. § 2554 (a). The second charged that on the same date and in the same city he "did then and there fraudulently and knowingly receive, conceal, buy and facilitate the transportation and concealment after importation of . . . heroin, knowing the same to be imported into the United States contrary to law; in violation of Section 174, Title 21, United States Code."

Before trial, petitioner moved for a bill of particulars requesting, among other things, the name, address and occupation of "John Doe." The Government objected on the ground that John Doe was an informer and that his identity was privileged. The motion was denied.

Petitioner, who was represented by counsel, waived a jury and was tried by the District Court. During the trial John Doe's part in the charged transaction was described by government witnesses, and counsel for petitioner, in cross-examining them, sought repeatedly to learn John Doe's identity. The court declined to permit this cross-examination and John Doe was not produced, identified, or otherwise made available. Petitioner was

found guilty on both counts and was sentenced to two years' imprisonment and a fine of $5 on each count, the sentences to run concurrently.[2]  The Court of Appeals sustained the conviction, holding that the concurrent sentence was supported by the conviction on Count 2 and that the trial court had not abused its discretion in denying petitioner's requests for disclosure of Doe's identity. 229 F. 2d 812.  We granted certiorari, 351 U. S. 936, in order to pass upon the propriety of the nondisclosure of the informer's identity and to consider an alleged conflict with *Portomene* v. *United States,* 221 F. 2d 582; *United States* v. *Conforti,* 200 F. 2d 365; and *Sorrentino* v. *United States,* 163 F. 2d 627.

At the trial, the Government relied on the testimony of two federal narcotics agents, Durham and Fields, and two Chicago police officers, Bryson and Sims, each of whom knew petitioner by sight.  On the night of August 12, 1954, these four officers met at 75th Street and Prairie Avenue in Chicago with an informer described only as John Doe.[3]  Doe and his Cadillac car were searched and no narcotics were found.  Bryson secreted himself in the trunk of Doe's Cadillac, taking with him a device with which to raise the trunk lid from the inside.  Doe then drove the Cadillac to 70th Place and St. Lawrence Avenue, followed by Durham in one government car and Field and Sims in another.  After an hour's wait, at about 11 o'clock, petitioner arrived in a Pontiac, accompanied by an un-

---

[2] The judgment of conviction provided for a $5 fine on "each" count, to "run concurrently."  The Government stated, during the argument before this Court, that this judgment has been construed administratively as imposing only one $5 fine.  We therefore assume, without so deciding, that the judgment imposed a fully concurrent sentence.

[3] Durham, Bryson and Sims, among them, testified that Doe was an "informer" and a "special employee" who had been known to the federal agents for several years.

identified man. Petitioner immediately entered Doe's Cadillac, taking a front seat beside Doe. They then proceeded by a circuitous route to 74th Street near Champlain Avenue. Both government cars trailed the Cadillac but only the one driven by Durham managed to follow it to 74th Street. When the Cadillac came to a stop on 74th Street, Durham stepped out of his car onto the sidewalk and saw petitioner alight from the Cadillac about 100 feet away. Durham saw petitioner walk a few feet to a nearby tree, pick up a small package, return to the open right front door of the Cadillac, make a motion as if depositing the package in the car, and then wave to Doe and walk away. Durham went immediately to the Cadillac and recovered a package from the floor. He signaled to Bryson to come out of the trunk and then walked down the street in time to see petitioner re-enter the Pontiac, parked nearby, and ride away.

Meanwhile, Bryson, concealed in the trunk of the Cadillac, had heard a conversation between John Doe and petitioner after the latter had entered the car. He heard petitioner greet John Doe and direct him where to drive. At one point, petitioner admonished him to pull over to the curb, cut the motor, and turn out the lights so as to lose a "tail." He then told him to continue "further down." Petitioner asked about money Doe owed him. He advised Doe that he had brought him "three pieces this time." When Bryson heard Doe being ordered to stop the car, he raised the lid of the trunk slightly. After the car stopped, he saw petitioner walk to a tree, pick up a package, and return toward the car. He heard petitioner say, "Here it is," and "I'll call you in a couple of days." Shortly thereafter he heard Durham's signal to come out and emerged from the trunk to find Durham holding a small package found to contain three glassine envelopes containing a white powder.

A field test of the powder having indicated that it contained an opium derivative, the officers, at about 12:30 a. m., arrested petitioner at his home and took him, along with Doe, to Chicago police headquarters. There petitioner was confronted with Doe, who denied that he knew or had ever seen petitioner.[4] Subsequent chemical analysis revealed that the powder contained heroin.

## I.

Petitioner contends that the trial court erred in upholding the right of the Government to withhold the identity of John Doe. He argues that Doe was an active participant in the illegal activity charged and that, therefore, the Government could not withhold his identity, his whereabouts, and whether he was alive or dead at the time of trial.[5] The Government does not defend the nondisclosure of Doe's identity with respect to Count 1, which charged a sale of heroin to John Doe, but it attempts to sustain the judgment on the basis of the con-

---

[4] Police Officer Bryson testified as follows:

"Q. Well, did he [John Doe] say anything with reference to an acquaintanceship or any prior association with this man [petitioner] or any transaction with this man?

. . . . .

"A. Well, he said he didn't know the Defendant here. He said he had never seen him before."

[5] The following colloquy occurred between Chester E. Emanuelson, the government counsel, and Maurice J\ Walsh, petitioner's counsel:

"Mr. Emanuelson: . . .

. . . . .

"The reason we do not want to reveal his [Doe's] name is that there are other matters that are pending, I have been told—I know of one myself—and the cases hold that we do not have to reveal the informer's name. Now, if there is some reason—

"Mr. Walsh: Well, is there any activity of the informer which will

viction on Count 2, charging illegal transportation of narcotics.[6] It argues that the conviction on Count 2 may properly be upheld since the identity of the informer, in the circumstances of this case, has no real bearing on that charge and is therefore privileged.

What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. *Scher* v. *United States,* 305 U. S. 251, 254; *In re Quarles and Butler,* 158 U. S. 532; *Vogel* v. *Gruaz,* 110 U. S. 311, 316. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

---

be curtailed by reason of the disclosure of his name? Would you answer that?

"Mr. Emanuelson: Any activities?

"Mr. Walsh: Yes.

"Mr. Emanuelson: From this point forward, no.

"Mr. Walsh: Is there any occasion upon which he will be called to testify?

"Mr. Emanuelson: No."

In a later colloquy Mr. Emanuelson stated: "[A]s I understand it, the reason his [Doe's] name has not been disclosed is because he is acting as a Government employee in other cases and it would help other persons in other matters that are pending."

[6] Since the concurrent sentence did not exceed that which lawfully might be imposed under a single count, the judgment may be affirmed if the conviction on either count is valid. *Pinkerton* v. *United States,* 328 U. S. 640, 641–642, n. 1; *Hirabayashi* v. *United States,* 320 U. S. 81, 85; *Abrams* v. *United States,* 250 U. S. 616, 619; *Claassen* v. *United States,* 142 U. S. 140, 146–147.

The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged.[7] Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.[8]

A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful

---

[7] *Foltz* v. *Moore McCormack Lines*, 189 F. 2d 537, 539–540; VIII Wigmore, Evidence (3d ed. 1940), § 2374 (1); A. L. I., Model Code of Evidence (1942), Rule 230. But cf. *In re Quarles and Butler*, 158 U. S. 532; *Vogel* v. *Gruaz*, 110 U. S. 311, 316.

[8] *Sorrentino* v. *United States*, 163 F. 2d 627, 629; *Pihl* v. *Morris*, 319 Mass. 577, 578–580, 66 N. E. 2d 804, 805–806; *Commonwealth* v. *Congdon*, 265 Mass. 166, 174–175, 165 N. E. 467, 470; *Regina* v. *Candy*, cited 15 M. & W. 175; VIII Wigmore, Evidence (3d ed. 1940), § 2374 (2).

The record contains several intimations that the identity of John Doe was known to petitioner and that John Doe died prior to the trial. In either situation, whatever privilege the Government might have had would have ceased to exist, since the purpose of the privilege is to maintain the Government's channels of communication by shielding the identity of an informer from those who would have cause to resent his conduct. The Government suggests that if petitioner knew John Doe's identity, the court's failure to require disclosure would not be prejudicial even if erroneous. See *Sorrentino* v. *United States*, 163 F. 2d 627. However, any indications that petitioner, at the time of the trial, was aware of John Doe's identity are contradicted by the testimony of Officer Bryson that John Doe at police headquarters denied knowing, or ever having seen, petitioner. The trial court made no factual finding that petitioner knew Doe's identity. On this record we cannot assume that John Doe was known to petitioner, and, if alive, available to him as a witness. Nor can we conclude that John Doe died before the trial.

to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.[9]  In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.[10]  Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause.  In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication.[11]

Three recent cases in the Courts of Appeals have involved the identical problem raised here—the Government's right to withhold the identity of an informer who helped to set up the commission of the crime and who was present at its occurrence.  *Portomene* v. *United States,* 221 F. 2d 582; *United States* v. *Conforti,* 200 F. 2d 365; *Sorrentino* v. *United States,* 163 F. 2d 627.  In each case it was stated that the identity of such an informer must be disclosed whenever the informer's testi-

---

[9] See, *e. g., Scher* v. *United States,* 305 U. S. 251; *Wilson* v. *United States,* 59 F. 2d 390; *Centoamore* v. *Nebraska,* 105 Neb. 452, 181 N. W. 182.  Early decisions established that the scope of the privilege was in the discretion of the trial judge.  Disclosure was compelled when he found it "material to the ends of justice . . . ." *Regina* v. *Richardson,* 3 F. & F. 693, 694 (1863).  See also, *Marks* v. *Beyfus,* L. R. 25 Q. B. D. 494, 498 (1890).  In the *Scher* case, *supra,* at 254, this Court said that "public policy forbids disclosure of an informer's identity unless essential to the defense, as, for example, where this turns upon an officer's good faith."

[10] See *United States* v. *Coplon,* 185 F. 2d 629, 638; *United States* v. *Andolschek,* 142 F. 2d 503, 506.

[11] *E. g., Scher* v. *United States, supra; United States* v. *Li Fat Tong,* 152 F. 2d 650; *Wilson* v. *United States, supra; United States* v. *Keown,* 19 F. Supp. 639.

mony may be relevant and helpful to the accused's defense.[12]

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

## II.

The materiality of John Doe's possible testimony must be determined by reference to the offense charged in Count 2 and the evidence relating to that count. The

---

[12] In the *Portomene* case, *supra,* the accused was charged with two sales of narcotics to an informer. The accused took the stand, denied selling narcotics, and testified that the person he believed to be the informer had a grudge against him. The Fifth Circuit held that disclosure was essential to the defense.

In the *Conforti* case, *supra,* the accused was charged with possession of counterfeit notes. Agents overheard the informer make arrangements with the accused, saw the informer meet the accused and a package transferred, and then received from the informer a package containing counterfeit money. The Seventh Circuit stated that the accused would have been entitled to disclosure of the informer's identity if a proper demand had been made at the trial.

In the *Sorrentino* case, *supra,* the accused was charged with both sale and possession of narcotics. Government agents saw the accused go into a house with the informer after arrangements for a sale had been overheard, and the informer later turned over narcotics to the agents. The Ninth Circuit stated that the accused was entitled to disclosure under these circumstances, but the conviction was affirmed on the ground that the record demonstrated that the accused knew the identity of the informer.

See also, *Crosby* v. *Georgia,* 90 Ga. App. 63, 82 S. E. 2d 38.

charge is in the language of the statute. It does not charge mere possession; it charges that petitioner did "fraudulently and knowingly receive, conceal, buy and facilitate the transportation and concealment after importation of . . . heroin, knowing the same to be imported into the United States contrary to law . . . ." While John Doe is not expressly mentioned, this charge, when viewed in connection with the evidence introduced at the trial, is so closely related to John Doe as to make his identity and testimony highly material.

It is true that the last sentence of subdivision (c) of § 2 authorizes a conviction when the Government has proved that the accused possessed narcotics, unless the accused explains or justifies such possession.[13] But this statutory presumption does not reduce the offense to one of mere possession or shift the burden of proof; it merely places on the accused, at a certain point, the burden of going forward with his defense.[14] The fact that petitioner here was faced with the burden of explaining or justifying his alleged possession of the heroin emphasizes his vital need for access to any material witness. Otherwise, the burden of going forward might become unduly heavy.

The circumstances of this case demonstrate that John Doe's possible testimony was highly relevant and might

---

[13] See n. 1, *supra*, where the material part of the statutory provision is quoted in full.

[14] *Casey* v. *United States*, 276 U. S. 413, 418; *United States* v. *Chiarelli*, 192 F. 2d 528, 531; *Stoppelli* v. *United States*, 183 F. 2d 391; *Landsborough* v. *United States*, 168 F. 2d 486.

Petitioner contends that the Government in all cases must make a further affirmative showing that the accused knew that he possessed narcotics. He argues that its failure to do so here entitles him to an acquittal. That contention, however, has been decided against petitioner in the cases cited above.

have been helpful to the defense. So far as petitioner knew, he and John Doe were alone and unobserved during the crucial occurrence for which he was indicted. Unless petitioner waived his constitutional right not to take the stand in his own defense, John Doe was his one material witness. Petitioner's opportunity to cross-examine Police Officer Bryson and Federal Narcotics Agent Durham was hardly a substitute for an opportunity to examine the man who had been nearest to him and took part in the transaction. Doe had helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment. He might have thrown doubt upon petitioner's identity or on the identity of the package. He was the only witness who might have testified to petitioner's possible lack of knowledge of the contents of the package that he "transported" from the tree to John Doe's car. The desirability of calling John Doe as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide.

Finally, the Government's use against petitioner of his conversation with John Doe while riding in Doe's car particularly emphasizes the unfairness of the nondisclosure in this case. The only person, other than petitioner himself, who could controvert, explain or amplify Bryson's report of this important conversation was John Doe. Contradiction or amplification might have borne upon petitioner's knowledge of the contents of the package or might have tended to show an entrapment.

This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged. The informer was the only witness in a position to amplify or contradict the testimony of government witnesses. Moreover, a government witness testified that Doe denied knowing petitioner or ever hav-

ing seen him before. We conclude that, under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of repeated demands by the accused for his disclosure.[15]

Petitioner also presents a claim of error arising out of a controversy over the correctness of an entry, made on the envelope containing the heroin, to the effect that the heroin had been found by Bryson. The undisputed testimony of the officers was that the heroin had been found by Durham and handed by him to Bryson who, in turn, handed it to Fields who made the erroneous entry. On the basis of this discrepancy, petitioner sought to obtain Durham's written report to the Federal Narcotics Bureau concerning the case. Although this discrepancy dealt with the relatively minor matter of who had first found the package, it also reflected upon the credibility of Durham and Fields, two of the Government's principal witnesses. However, in view of the decision we have reached on other grounds, we deem it unnecessary to determine whether the denial of this request, even if erroneous, was prejudicial to petitioner.

---

[15] Thus far we have dealt largely with the trial court's refusal, at the trial, to require disclosure of the informer's identity. In view of the Government's exclusive reliance here upon Count 2, we have considered this question only with respect to that count. However, we think that the court erred also in denying, prior to the trial, petitioner's motion for a bill of particulars, insofar as it requested John Doe's identity and address. Since Count 1 was then before the court and expressly charged petitioner with a sale of heroin to John Doe, it was evident from the face of the indictment that Doe was a participant in and a material witness to that sale. Accordingly, when his name and address were thus requested, the Government should have been required to supply that information or suffer dismissal of that count.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACK and MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE CLARK, dissenting.

It is with regret that I dissent from the opinion of the Court, not because I am alone, but for the reason that I have been unable to convince the majority of the unsoundness of its conclusion on the facts here and the destructive effect which that conclusion will have on the enforcement of the narcotic laws. The short of it is that the conviction of a self-confessed dope peddler is reversed because the Government refused to furnish the name of its informant whose identity the undisputed evidence indicated was well known to the peddler. Yet the Court reverses on the ground of "unfairness" because of the Government's failure to perform this fruitless gesture. In my view this does violence to the common understanding of what is fair and just.

First, it is well to remember that the illegal traffic in narcotic drugs poses a most serious social problem. One need only read the newspapers to gauge its enormity. No crime leads more directly to the commission of other offenses. Moreover, it is a most difficult crime to detect and prove. Because drugs come in small pills or powder and are readily packaged in capsules or glassine containers, they may be easily concealed. They can be carried on the person or even in the body crevasses where detection is almost impossible. Enforcement is, therefore, most difficult without the use of "stool pigeons" or informants.

Their use has long had the approval of the courts. To give them protection governments have always followed a policy of nondisclosure of their identities. Experience teaches that once this policy is relaxed—even though the informant be dead—its effectiveness is destroyed. Once an informant is known the drug traffickers are quick to retaliate. Dead men tell no tales. The old penalty of tongue removal, once visited upon the informer Larunda, has been found obsolete.

Of course where enforcement of a nondisclosure policy deprives an accused of a fair trial it must either be relaxed or the prosecution must be foregone. The Government is fully aware of this dilemma and solves it every day by foregoing prosecutions in many cases where evidence essential to the defense would require disclosure. But this is not such a case.

In note 8 of the majority opinion, *ante,* p. 60, the Court makes much of testimony of a police officer that the informant, while at the police station, "denied knowing, or ever having seen, petitioner." I submit that this testimony is taken out of its proper setting. The informant was in custody when petitioner was arrested and the two were taken to the police station where each was kept in custody overnight. There, while in custody, they were interrogated together about the occurrences leading up to the arrests. The federal officer present at the time was questioned at the trial in regard to informant's answers at the station:

> "Q. As a matter of fact, [the informant] said he did not have a transaction with him, didn't he, in Roviaro's presence?
> "A. Do you want the entire conversation?
> "Q. Isn't what I asked you a fact?
> "A. No, sir. He didn't deny it.

"Q. Didn't [the informant] say he didn't even know him?

"A. Yes, sir; at first he did." [1]

In proper context this merely shows that the informant was carrying out a pretense that he too was arrested, was involved, and was not "squealing." In fact, officer Bryson attempted in his testimony to explain the "purpose" of the informant in so answering but was prevented by petitioner's counsel.

Moreover, the uncontradicted evidence is that the petitioner knew the informant and had associated with him for some time. Two officers testified that they had seen petitioner on June 22, 1954, enter the informant's car on Michigan Avenue in Chicago. Another saw informant and petitioner enter the latter's home together on June 28, only six weeks prior to the events in question here. Further testimony shows that the informant was indebted to the petitioner, that the petitioner had telephoned several times to informant's home and "at the place," that petitioner was going to call again in a couple of days after the date of his arrest, and that he entered informant's car on the night of the arrest and drove around with him for several miles. The Court asserts that the conversation between the informant and petitioner while on this ride "emphasizes the unfairness of the nondisclosure in this case." But if we limit the officer's testimony to the statements of petitioner alone, the testimony would prove the intimacy of the acquaintance between petitioner and the informant. It would show that petitioner directed the informant to the cache and admonished him to turn out the car lights because of a "tail"; that petitioner knew

---

[1] On petitioner's objection this testimony was subsequently stricken. However, police officer Bryson during cross-examination provided substantially this same testimony and the inadvertence of the Government in failing to object permitted it to stand.

how to reach informant by telephone and had tried to phone him; that he had brought him "three pieces *this time,*" indicating prior sales; that informant was indebted to him; that when they approached the cache he directed the informant to stop the car; and that finally when he returned with the narcotics, petitioner said "Here it is, I'll call you in a couple of days." All of this testimony was admissible against petitioner whether the informant was available or not or whether he was dead or alive. It proves beyond question that the two were closely acquainted. For the Court to conclude in the face of such a record that petitioner did not know the informant is to me fantastic.

But this is not all. The petitioner has not mentioned a single substantial ground essential to his defense which would make it necessary for the Government to name the informer. The Court mentions that there might have been entrapment. Petitioner not only failed to claim entrapment but his counsel appears to have rejected any suggestion of it in open court. I submit the Court should not raise it for him here. It should be noted that petitioner's counsel stated in open court that petitioner knew the informant and believed he was dead.[2] Were there

---

[2] The record discloses the following colloquy between petitioner's counsel, Mr. Walsh, and the court:

"Mr. Walsh: Your Honor, this is the point, actually: He has testified that John Doe [the informant] was present at 11th and State Street with the Defendant. We know that person, We know that person. That person is dead, as I understand it.

.          .          .          .          .

"By Mr. Walsh: [Cross-examination of Agent Durham].

"Q. I will ask him if the person as a matter of fact was not Tebbil Holmes?

.          .          .          .          .

"Q. Isn't the informer's name, or the person you contend is an informer, who has been mentioned by the prosecutor as an informer—isn't his name Tebbil Holmes?"

necessity to establish informant's identity or, if dead, his death, petitioner could easily have done so.[3]

In truth, it appears that petitioner hoped that the Government would not furnish the name for, if the informant was dead as he believed, petitioner's ground was cut from under him. If the informant was living he knew that even though his testimony was favorable it would not be sufficient to overcome the presumption of the statute. In fact, a casual reading of the record paints a picture of one vainly engaging in trial tactics rather than searching for real defenses—shadowboxing with the prosecution in a baseless attempt to get a name that he already had but in reality hoping to get a reversible error that was nowhere else in sight. We should not encourage such tactics.

In light of these facts the rule announced by the Court in note 8 of the opinion should be applied, *i. e.,* that the trial "court's failure to require disclosure would not be prejudicial even if erroneous. See *Sorrentino* v. *United States,* 163 F. 2d 627."

The position of the Court is that since the trial judge made no finding that petitioner knew the informant, the Government cannot successfully assert harmless error. It is true that the Court made no finding other than that of guilt. But this general finding is entitled to the support of every reasonable presumption. It would be reasonable to assume that the trial judge declined to order the disclosure because petitioner's counsel had said in open court that he knew the identity of the informant. Furthermore, petitioner has made no showing of how he

---

[3] A death certificate, State File No. 1665, Dist. No. 16.10, on file at the Bureau of Vital Statistics, Cook County Clerk's Office, 130 N. Wells St., Chicago, Illinois, indicates that a Tevell Holmes, Sr., died in Chicago on January 17, 1955.

was harmed by the nondisclosure—indeed he introduced no evidence of anything.

I come now to the necessary proof required for a finding of guilt under Count 2. All that is necessary here is proof of possession of unstamped narcotics, such as heroin. The direct, uncontroverted evidence of possession, as well as transportation, is in the record. Two officers, one a local policeman and the other a regular federal narcotics agent, saw petitioner when he had in his hand a package containing heroin. The package was unstamped. A third officer saw petitioner leave the scene of his crime, get into his car, and ride away. The identification by each of the three is positive and stands uncontradicted. Under the Narcotic Drugs Act, 65 Stat. 767, 21 U. S. C. § 174, this alone is *prima facie* evidence of guilt. Petitioner did not rebut it. In this connection it is well to point out petitioner's statement soon after his arrest. The officers asked him: "Are you going to take this [rap] by yourself or are you going to name your connection?" Petitioner replied that they were wasting their time—"There's no use asking me about anybody else. . . . I don't want to get anybody else in trouble. *You got me. I've stood up twice before and I can stand up again.* Besides that, you've got to convict me anyhow." (Emphasis added.) In view of this, I submit that there is no question of guilt involved here.

Feeling as I do that the opinion of the Court seriously jeopardizes the privilege of the Government in cases involving informers, that their use in narcotic cases is an absolute necessity in the proper administration of the narcotic laws, and that the disclosure required here today is not only unessential to the petitioner's defense but on the other hand undermines a long-standing policy necessary to the successful enforcement of the narcotic laws, I respectfully dissent.