UNITED STATES of America

v.

William ESTEP.

Cr. No. 1922.

United States District Court
N. D. Texas, Abilene Division.

May 13, 1957.

A. J. Marshall, Dallas, Tex., for petitioner.

Heard L. Floore, U. S. Atty., Fort Worth, Tex., for the U. S.

DAVIDSON, Chief Judge.

This is a petition of the prisoner William Estep to reopen and set aside the judgment of conviction.

Title 28, Section 2255 by its wording and by decisions of interpretation leaves much to the trial judge's discretion. Where and when may he use this discretion and when does he abuse it? The whole field of our jurisprudence must answer.

The work of the American courts when connectedly and coherently done presents a beautiful picture in panoramic view of justice in action. A jury of 12 minds in its varied and composite experience runs the evidence through a sieve and finds the truth.

The trial court is the judge of the law both in letter and spirit. On the one hand he hears the complaint of the injured or the outcry of outraged society and then the plea for mercy from a, perhaps, repentant criminal. A prayer rises in the soul of the judge that he may rule wisely and well in the light of both justice and mercy; a judgment is pronounced and entered.

A strong intermediate court reviews this judgment and polishes off the inequalities, having always in mind that the trial judge saw and heard at first hand of the injuries, the motives and conduct of the parties, and here ends the right of appeal, so far as the individual defendant is to be primarily considered.

Our great Supreme Court, the highest tribunal of the land, may now in its discretion, because of importance of the legal questions involved, elect to review the case. The primary purpose is to keep the law straight. Like the surveyor in the forest the high judge sets up his tripod, levels his compass, gets his bearings, then he steps in front of his compass, looks back from whence he came. Thus poised he goes around his compass and through his telescope he finds where he is going and goes there. The trial court may act within the spirit of the law, but the high court hews to the line. His word is the letter of the law. So well does he spell it out that all the lawyers of the country may know what it is and without hesitancy so advise their clients.

■ This straight line which he has hewn may affect areas not unfavorably or it may strike where the passing of time has made it unworkable. Now the Congress re-orientates the judge with an amended law. The judge of the lower court must keep out of the jury box and

the judge of the high court out of the legislative halls.

The petition of William Estep seeks to set aside the verdict and judgment of his conviction entered some three years ago in this court.

He was charged with defrauding people by the use of the United States mail in a scheme to sell stock in the Atomotor Manufacturing Company to manufacture atomotors. The atomotor was to be a fuelless machine. It was represented as an invention that would revolutionize industry and travel. In connection with the sale of his stock in such company he would also suggest the invention and production of a frictionless oil which would remove all tendency of a machine to slow down by reason of any friction.

The defendant in the trial, the petitioner here, was convicted on nine counts and judgment accordingly entered. He now urges that the verdict and judgment of the trial be set aside, the principal ground being that one of his counsel, the Honorable Maury Hughes, now deceased, was drunk and by reason of his intoxicated condition the defendant was denied counsel who could intelligently understand and present his defenses. The Court had assessed what may be considered a moderate sentence of five years which was duly affirmed by the Circuit Court at New Orleans, 223 F.2d 19.

The petitioner also sets forth in his complaint two allegedly forged letters. These letters have no connection with the trial upon which he was convicted.

██ Counsel Maury Hughes, being a lawyer, was as such an officer of the court. The presumption is that he was normal and capable. If he was drunk and not able to properly represent his client, surely the judge of the court or some of the officers of the court during a five-day trial would have observed such situation.

The judge that tried the case is now hearing this petition. He takes judicial knowledge of the fact that Counsel Hughes was duly sober, possessed of his ability and mental capacity to carry on the trial and the Court remembers him as one of the outstanding criminal lawyers of the state, and further, that his co-counsel, the Honorable Howard Dailey, was likewise a lawyer of unusual ability and whose name appears in the cases coming out of the Circuit Court in many volumes. Even though Hughes had never entered the case, Counsel Dailey was abundantly able to give him adequate representation that was needed for his defense.

We therefore find against his complaint of not being properly represented by counsel. 'Twould indeed be a dumb Court who could not see that leading counsel was intoxicated during a five-day trial.

██ There were two other matters, however, in connection with the hearing that gave us some concern: One, the summoning of a large list of witnesses. The taking of these people, some of them from a great distance, and bringing them into court unless it appeared that they would be needed and used was a matter we think that the Court should give due consideration. Acting again within his discretion with regard to the probable value and materiality of the testimony and particularly placing a limit upon the number, the attorney for petitioner failing to show the purpose of the testimony or its materiality, made it necessary to strike names from a numerous list tendered.

██ The second matter which gave us concern was the necessity of having defendant personally present at the time of the hearing. The statute, Title 28, Section 2255, expressly says that the defendant need not be personally present. However, the Supreme Court in the Hayman case [Hayman v. U. S.], 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232, and some later cases in the Circuit Court, indicates that the defendant should in certain cases be personally present.

We might notice the purpose and circumstances under which the present statute was enacted. Before the passage of this act and after the opinion in the

case of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, a great many petitions for habeas corpus were filed by prisoners incarcerated in the U. S. prisons. These petitions for habeas corpus grew quite numerous. At one time we had on our table as many as ten of these petitions, but the greater burden of them fell on the judges in the districts in which prisons were located. Judge Underwood of Atlanta, a very conscientious official, is thought to have injured his health if not shortened his life in trying to give a hearing to the many petitions that came before him. Judge Parker, Chief Judge of the Fourth Circuit, and others who attend the Judicial Conference became especially interested in this situation and Congress was induced to pass the present law, believing no doubt that it would not only relieve the judges in districts in which the prisons were located, but when the petitioner knew he had to go back before the judge that tried him he might not be so interested in having his case reviewed insomuch that the judge would have judicial knowledge of much that happened at that trial.

A man in prison with a substantial sentence has less occasion to fear the penalties of perjury than one outside who still has his name, liberty and reputation. Therefore these petitions may be filed with affidavits reciting things that are not only improbable but unbelievable. A defendant once stated during his trial in my court that Judge McCrory, judge of a state court in San Antonio, descended from the judge's bench and came out on the floor and joined the sheriff and policeman in beating him unmercifully. I gave little credence to the matter, Judge McCrory being one of the leading men and jurists of the state. And I think we were well within our province in taking such course.

To more fully illustrate and discuss the problem now here we might review briefly the case of Leonard Williams.

On the 13th of August, 1952, the defendant, Leonard Williams, entered a plea of guilty to bank robbery and was assessed a penalty of 20 years. When he entered his plea of guilty the Court explained to him in detail what a plea meant and what the effect would be and that he was entitled to a trial before a jury and that no man had to plead guilty. The Court offered him a lawyer. Without protest he signed a written waiver waiving indictment by the grand jury and waiving a jury trial and submitted his case to the Court, the court reporter making notes of the proceeding.

Subsequently, after he had been inducted into prison, the defendant filed an affidavit with petition to reopen his case. He charged that two FBI officers, a policeman and a deputy marshal had beaten him until he was practically unconscious and had compelled him under threat of his life to enter the plea of guilty which he had made in court.

He was at that time in the United States Prison at Alcatraz and the Court having judicial knowledge of the circumstances surrounding the plea of guilty as entered and knowledge that the defendant was above average intelligence did not feel disposed to bring him from Alcatraz to be present at the trial. The Court of Appeals, Williams v. United States, 5 Cir., 227 F.2d 48, differed with us about this so the defendant was ordered present. He had a record of escaping from the officers on 13 different occasions, a fair sample of which was where a plumber went into his cell in prison to fix the sewerage. The plumber was left unconscious while the prisoner wore his clothing away to make an escape.

The circumstances reasonably suggested to the Marshal that he wanted to be brought out of prison and over the long trip from Alcatraz to Dallas as such would afford him an additional opportunity to make an escape.

A plane with two guards was engaged to make the trip and he was then given a hearing in Dallas on his petition. Then every person who had handled him or been about him since the day of his arrest to the day of trial was brought into

**672**

court; namely, Rufus Pevehouse, former United States Deputy Marshal and now Sheriff of Navarro County, Texas; two members of the Federal Bureau of Investigation; namely, James C. Kennedy and George Colson; and J. W. Dillinger, Chief of Police of Taylor, Texas. Mr. Dillinger, the Chief of Police, testified that when the defendant saw them he ran down an alley and entered a restaurant and climbed to the roof of the house and that he was captured as he came down, that not a lick was struck or a threat made but that he was carried by him and the FBI officers to the City Hall in Taylor and there his written statement was taken but no threat was made and he told him he did not have to make a statement unless he wanted to. Mr. Dillinger has been on the police force at Taylor for more than 30 years. He was there when Governor Moody was a boy and lived in that town, a man of unquestioned probity. Officers Kennedy and Colson testified in all particulars as did Chief of Police Dillinger, and so did Sheriff Rufus Pevehouse. Pevehouse had been a deputy marshal, serving on many occasions in my courtroom, and retiring from the force was selected by the people of Navarro County as their sheriff. He testified substantially as did the FBI men and Chief of Police Dillinger. No man saw or heard of anybody beating or threatening the defendant. The Court could do only one thing, remand him back to Alcatraz.

Our discussion here is not a criticism of our brethren of the higher court, for if they were here and we were there we think they would write and act as we do.

The lower court tries the man that he sees; the supreme court tries the man that he reads about. The victim, the verdict and the attitude of the defendant all come in review before the trial judge. The higher court is introduced to the defendant from a different angle, usually by the defendant himself or his lawyer. The injured victim, the outraged society come only on paper and perhaps by a government counsel or solicitor who heard none of the case.

The petitioner approaches the higher court with seeming confidence that this appellate tribunal will give his evidence, interested though he is, the same weight and credibility as that of the officers of the trial court, notwithstanding the presumption of regularity attaching to court procedure.

It is error to suppose that our prison population is composed only of the illiterate, the weak and the simple. These are taken to court, but are often cared for by the trial judge and his probation officers.

There are good minds and ingenious thinkers in our prisons. Law books are often made available and they read them for a purpose and to no uncertain end. Some of those who "want out" can cite as many authorities as did Judge Story in the Dartmouth College case, Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L.Ed. 629. These may not be in point, but they at least touch the subject and the prisoner's contention is usually dressed to fit the one found in the book.

One may well ask, is not there a trend to make acquittal of the criminal easy. It will hardly be gainsaid that trends do occur. With all deference to others, we have just read with much interest the dissenting opinion of Justice Clark in the case of Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 630, 1 L.Ed.2d 639, in which he uses this very apt language: "* * * It is well to remember that the illegal traffic in narcotic drugs poses a most serious social problem. One need only read the newspapers to gauge its enormity. No crime leads more directly to the commission of other offenses. Moreover, it is a most difficult crime to detect and prove."

Justice Clark expresses the view of the trial court.

We may well remember the words of the famous Roman lawyer, "It is cruel to the innocent not to punish the guilty."

Ninety per cent of the convictions had in the trial court for sale and dissemination of narcotic drugs are linked to the

work and the evidence obtained by an informer. If that informer is not to have his life protected there won't be many informers hereafter. We read in the press, as Justice Clark says, about the doings of the professional criminals of the underworld in our cities, but we will confine ourselves to Dallas and its vicinity.

The Court takes judicial knowledge of a number of informers that have appeared in his court who have been murdered or foully treated. Mr. Warren Heddens who for many years has been in the government narcotic service furnishes us with the details of some of these cases which we append in the footnote hereto.[1]

Criminal litigation should of necessity have some terminal facilities. There must be some final judgment had from which the adjudged criminal may not with his own testimony reopen at his pleasure. Although such may be attempted we believe that a rule requiring or stating a uniformity of course cannot be made, because the cases are not made in the same mold.

In the Hayman case, 342 U.S. 223, 72 S.Ct. 274, the Court laid down this rule:

"Where, as here, there are substantial issues of fact as to events in which the prisoner participated, the trial court should require his production for a hearing."

This rule may be easily construed to call for a retrial of the defendant on the matters contained in his affidavit. In light of the statute and in light of other portions of this opinion itself we do not think the Supreme Court intended to go that far. When is there a substantial issue of fact? Does the affidavit of the prisoner alone raise such an issue? We do not think that this can by any means be true. The presumption of regularity in the trial court is not overcome by an affidavit of improbable verity. More-

---

1. Ellis (Buster) Lott helped the government to make many large and important arrests as an informer. One of the narcotic peddlers or users cut his throat from ear to ear. He died without making a statement.

George Washington Jenkins as an informer made numerous large purchases of narcotics from wholesale dealers. While sitting in his front bedroom his house was riddled with bullets of a 45 calibre machinegun.

Otis Riley Matillar, a Negro informer, developed a number of cases for the narcotic agents. When his identity became known he was shot through the body.

Richard Lane, white male, gave out information to the narcotic agents. He was shot and left in an outhouse to die but recovered.

Alfred B. Carrizales, a Mexican male, developed a number of narcotic connections under the direction of the Dallas Police Department. He was shot and died.

Ernest James Mayfield, a Negro, made several cases, was stabbed in the back and died.

Patricia Ann Harmon, a white female, furnished information to the Police Department on narcotic violators. Her body was found in Benbrook Lake with heavy log chains tied around her arms and legs.

Woodrow Montgomery, a Negro male, 29, worked as an informer against Negro marihuana peddlers. When his identity became known he was found lying in the gutter with his head beaten in with an iron pipe lying by.

Howard Dwayne Miller, Negro informer, assisted the narcotic squad of the Dallas police. After some arrests had been made he left Dallas and went to Fort Worth where his dead body was found in the city with a fractured skull.

In a similar manner the gang wars raged and when they suspected one of their number squealing on them the death penalty was assessed in these cases:
1. Olen Lee Alvey
2. David Laxton Batterton
3. Frank Charles Cates
4. James Buchanan Cavanaugh
5. Ray W. Cellars
6. Leroy (Tincy) Eggleston
7. Edell Evans
8. Sidney John Foley
9. Cecil Green
10. Holis Delois Green
11. Nelson Harris
12. Herbert B. Noble
13. Ivan Jerry Poole
14. Travis Scott
15. Olen Tyler
16. Louis E. (Buster) Vinson

over, the Court takes judicial knowledge of the things that occurred during the original trial and if the affidavit is in conflict with those things that he has knowledge of he is not bound to act upon such affidavit as having raised a substantial issue of fact. The Court may not only rely upon such judicial knowledge, but he may refresh his memory from the record in the case from the court reporter's notes and indeed to a degree by the memory of the Clerk, the Marshal or bystanders.

If there be truth in the affidavit there will almost invariably appear some circumstances giving corroboration. If no corroboration is found, then unless it has been made in some other way to reasonably appear to the trial court that a wrong has been done which ought to be righted, the defendant need not be called to be personally present. When not called the Court saves its time, the inconvenience of attending witnesses and the nation's expense.

In cases where the Court after due consideration has a doubt as to the correctness of the procedure, it occurs to us he should first appoint counsel and that lawyer should state the grounds for summoning witnesses and collate the facts to be presented at the hearing so as to better aid the Court in determining the need for the presence of defendant.

When are there substantial issues? This decision is essentially a responsibility to be met by the trial judge. And we would not be presumptuous at this point to refer to the preparation of the trial judge in passing upon the question. He is usually a lawyer with 20 or more years of court practice before going on the bench. In other words, he is from among the top or cream of the trial lawyers. During his courtroom practice his adversary and the trial judge have well educated him in the knowledge that no one may represent clients of conflicting interests. In my more than 20 years of experience on the Federal bench I have my first Federal judge to find or see who would permit a trial to proceed under such conditions. In my experience upon the bench I have found no Federal judge that would permit counsel while intoxicated or under the influence of intoxicating drink to appear in court for a man whose life or liberty was at stake, or even in a civil case.

It is not our purpose to hand the trial court a bouquet, but when he is appointed it is usually with the active or tacit consent of the bar from which he is selected and his courtroom experience has peculiarly qualified him to meet such emergencies.

The American public has great confidence in their Federal courts. To uproot this confidence is to pull from under our nation's morale the very pillars of its existence.

Soon after my appointment to the bench a very fine old jurist, now gone, gave this advice: "Do not try to make yourself an appellate court. Concern yourself with administering justice and we will try to find enough law to sustain you."

The court of last resort primarily concerns itself with preserving and maintaining the law and with a keen blade it hews to the line so that all men may know what the law is today and tomorrow.

If the court of last resort enters into the realm of idealism and mercy and attempts to apply it in a given case, he may miss his mark by acting on remote control. The nurse on the battlefield who renders first aid is more effective than one that writes about it back at headquarters.

When our judicial system works in harmony it is beautiful to observe and behold.

Viewing the evidence together with those elements and facts of which we must take judicial knowledge, we are impelled to deny a review of the case.