[Crim. Nos. 7957, 7958. Second Dist., Div. One. June 6, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. OSCAR RENTERIA RODRIGUEZ, Defendant and Appellant.

(Two Cases.)

Bradford A. Arthur for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was charged in two separate cases, consolidated on appeal (Nos. 7957, 7958), with possession of heroin on March 1 and on March 6 respectively, and two prior felony convictions. Tried separately the court found him guilty in each, and the prior convictions to be true. He was sentenced to the state prison.

The evidence is necessarily viewed in a light most favorable to the judgments. In January 1961, Officer Archibald received information from a confidential informant that defendant was dealing in heroin from his house on 59th Street,

that he had an old green "Chevy" and probably hid narcotics in his back yard or garage. Because of insufficient experience with him the officers did not then consider this informant to be reliable and did not then act on his information. However, other information received from him at the same time concerning third persons, thereafter proved reliable and resulted in their arrest prior to March 1.

Approximately one week before defendant was arrested (March 1, 1960) Officer Archibald and his partner received further information about defendant from two other informants whom they considered reliable. They told the officers that defendant lived at 152 West 59th Street, that he was dealing in heroin from his house, the street and the school grounds during class intermission at the Fremont High School, that he was taking a night course there in basic electronics, that during class breaks he dealt in heroin on the school grounds, that he was unusual in that he carried a large number (as many as 200) of capsules of heroin in his pocket, and that he owned a forest-green Chevrolet. Upon receiving this information the officers checked defendant's record in the police record and identification division, which showed several arrests and that defendant was an ex-convict on parole for narcotics. Thereafter officers "staked" defendant's house on several occasions; they twice tried to follow him but gave up when he so maneuvered his vehicle in traffic that they knew he suspicioned he was being followed. On these two occasions defendant's driving actions were unusual—he was extremely aware of traffic around him, turned his head to the rear and watched traffic behind him, and after turning a corner slowed down to see if anyone might follow.

On March 1, 1961, around 3:30 or 4 p. m., the same two informants told the officers defendant would be at Fremont High School that night with heroin on his person. The officers went to the school and waited; at 6:45 p. m. they observed defendant drive onto the school grounds, park his car in the parkway between two buildings, lock the vehicle and walk in the direction of the classroom of basic electronics. They approached defendant in an unmarked car and asked him if he would move his car to let them through the parkway. As defendant turned and started toward his car Officer Archibald left the police car and started to walk up to him. The officer, walking toward defendant, asked him if he was Oscar Rodriguez, he said, "Yes"; he identified himself as a police officer and told defendant to keep his hand in sight, whereupon

defendant made a fast move with his left hand toward his left front pants pocket. Moving rapidly to defendant, the officer grabbed the upper portion of defendant's left front pocket, closing the top to prevent him from going into the pocket. On the outside of his pants the officer felt the articles in defendant's pocket; one was a round object about the size of a ping pong ball or a golf ball yielding to the touch but with harder objects inside; it felt to the officer as if it was a balloon containing a large number of capsules. He was an experienced narcotics officer, having previously participated as an arresting officer in over 100 narcotic arrests and as investigating officer in over 1,000 cases, 750 of which dealt with heroin capped in gelatine capsules, and he had four or five times seen capsules so contained. Feeling this article through the pocket, the officer believed the capsules to contain narcotics and said: "Yes." He then reached inside of defendant's pocket and removed a balloon containing 100 capsules of heroin; he asked defendant if he would have tried to swallow the balloon and he answered he would have either swallowed it or died trying. The officer removed the narcotic from defendant and then arrested him. They searched defendant's car and proceeded with him and the vehicle to the police garage to impound it; defendant asked them to stop at his house for the purpose of leaving some tools he had in the rear of his car. Pursuant to defendant's request the officers went to his home and knocked on the door; defendant's mother answered and the officer identified himself and said her son was under arrest. He showed her the capsules and said he had removed them from defendant; she invited him in. They told defendant they wanted to search the house; he said to "go ahead." They found $920 in a shoe box on the top shelf of defendant's bedroom closet and $300 in a pocket of a sport shirt (identified by defendant as his) hanging in a closet. They searched the garage and back yard and found on top of an ash can, located among trash containers, a brown paper bag. Sergeant Hill opened the bag, showed it to defendant and said: "Is this all of it?" He answered, "Yes." In the bag were 50 capsules of heroin, a yellow box containing four balloons of heroin, a green box of 11 caps filled with heroin, a number of empty caps, several balloons and measuring spoons.

At the police station defendant told officers that on March 1, he went to San Diego by bus and met his contact, gave him $1,000 and was told where he could go to pick up 5 ounces of heroin; that he used heroin by sniffing; that he would have

tried to swallow the balloon containing the 100 caps or died in the attempt; that the money found in his home was his; and that he was under Nalline supervision.

Evidence relating to the offense of March 6, 1960, (No. 7958) is not reviewed since defendant advances no assignments of error in connection with that case.

██ This appeal arises out of the trial court's refusal to permit the disclosure of the identity of the two reliable informants upon request of defense counsel on the cross-examination of Officer Archibald. We find no error in the nondisclosure inasmuch as sufficient probable cause for defendant's arrest existed without consideration of the information received from the informants; moreover, they were neither material witnesses on the issue of guilt nor "relevant and helpful to the defense of the accused, or essential to a fair determination of the cause." (*Roviaro* v. *United States*, 353 U.S. 53, 61 [77 S.Ct. 623, 1 L.Ed.2d 639].)

It is clear from the record that the role of the informers was limited; that they simply pointed the finger of suspicion at defendant, putting the wheels of investigation in motion; and that they in no way participated in the criminal act for which the defendant, a week later, was arrested. (*People* v. *Lawrence*, 149 Cal.App.2d 435 [308 P.2d 821] ; *People* v. *McShann*, 50 Cal.2d 802 [330 P.2d 33].) Nor would the identity of the two informants have been necessary or even helpful to the defendant's case. Under the evidence, they could hardly have been material witnesses as to any of the facts relating directly to the question of guilt, as in *People* v. *McShann*, 50 Cal.2d 802 [330 P.2d 33], for nothing they could have testified to or advised defendant for the purpose of cross-examining the officer would have been relevant to whether on March 1 he in fact had heroin in his possession on the school grounds at the time the officers interrogated and searched him prior to his arrest. Moreover, defendant admitted at the trial he actually had the narcotic on his person on March 1 and that the officers took it from him; his defense consisted of his claim that at the time the officers took the capsules from his pocket they held him at gun point. Therefore, defendant having admitted his possession of heroin at the time, we fail to see how any testimony or information the informants might have given—relative to having a week before his arrest told the officers where defendant lived, that he was reputed to carry heroin in his possession and that he dealt in narcotics

on the school grounds, and several hours before, told them defendant would be at the school that night with heroin in his possession—could alter the finding of the trial judge, based upon the testimony of both the officer and the defendant, that immediately prior to his arrest he had narcotics on his person, the very essence of the offense with which he was charged.

Further, the officers, without the information given to them by the two informants, had at the time they arrested defendant more than sufficient information in their possession to cause them to believe that he then had narcotics on his person. This consisted of information given to the officers by the first informant, who although at first considered unreliable, proved to be reliable prior to March 1, upon which they were then free to act; knowledge from their perusal of official police records relative to defendant, disclosing his identity, description, previous arrests, prior felony narcotic conviction and subsequent parole (*People* v. *Gorg,* 157 Cal.App.2d 515 [321 P.2d 143] ; *People* v. *Wickliff,* 144 Cal.App.2d 207 [300 P.2d 749]) ; defendant's furtive conduct to elude surveillance, observed by officers on two occasions within the week prior to arrest (defendant admitted at the police station that on those occasions he recognized them as police officers and intentionally evaded them) (*People* v. *Augustine,* 152 Cal.App.2d 264 [313 P.2d 37]) ; defendant's suspicious act of rapidly moving his hand toward his pocket in order to dispose of the narcotic by swallowing it, immediately before the arrest (*People* v. *Taylor,* 174 Cal.App.2d 448 [344 P.2d 837]) ; the officer's prior experience in numerous narcotic arrests and law enforcement, and their familiarity with heroin and how it is carried on the person, together with his identification of the object in defendant's pocket to be a balloon filled with gelatin capsules containing heroin ; and the defendant's admission to the officer that the object in his pocket was heroin when confronted with the latter's discovery of the narcotic in his pocket through the material of his pants.

Entirely discounting the confidential communication to the officers by the two undisclosed informants, the officers had sufficient information in their possession immediately prior to their search and arrest of defendant to constitute reasonable grounds to believe then that he had heroin on his person and was committing a felony. (*People* v. *Taylor,* 174 Cal.App.2d 448 [344 P.2d 837] ; *People* v. *Augustine,* 152 Cal.App.2d 264 [313 P.2d 37] ; *People* v. *Gorg,* 157 Cal.App.2d 515 [321

P.2d 143].) It is clear that the sole basis for the search and seizure was not the information received from the two informants as in *Priestly* v. *Superior Court,* 50 Cal.2d 812 [330 P.2d 39], wherein acting solely on information from the two informers the officers went to the defendant's apartment, knocked on the door and placed defendant under arrest. Having reasonable cause to believe defendant was then committing a felony, the officers had the right to search the defendant; having done so and found the contraband, they had a right, indeed a duty, to arrest.

The subsequent search of his house and the premises, to which defendant and his mother freely consented, resulting in the seizure of the money, heroin and paraphernalia, was not unreasonable and was a valid one. (*People* v. *King,* 175 Cal.App.2d 386 [346 P.2d 235].) And the finding of these articles justified defendant's subsequent detention. (*People* v. *Melody,* 164 Cal.App.2d 728 [331 P.2d 72]; *People* v. *King,* 175 Cal. App.2d 386 [346 P.2d 235].)

The judgments are affirmed.

Wood, P. J., and Fourt, J., concurred.