No. 23242.

JOSEPH MARVIN WHALEY *v*. THE PEOPLE OF THE STATE OF COLORADO.
(466 P.2d 927)

Decided March 16, 1970. Rehearing denied April 6, 1970.

Frank J. Reinhard, Jr., for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, for defendant in error.

*In Department.*

Opinion by Mr. Chief Justice McWilliams.

Whaley was convicted by a jury of the crimes commonly known as receiving stolen goods and larceny by bailee and in connection therewith he was sentenced to a term of from five to six years in the state penitentiary on each count, the sentences to be served concurrently and not consecutively. Whaley now seeks reversal of the judgment and sentences thus imposed.

The Attorney General concedes that the evidence is legally insufficient to support Whaley's conviction for the crime of larceny by bailee, inasmuch as the People failed to establish, even *prima facie*, the existence of a bailment, be it a bailment by finding or otherwise. We agree and that particular judgment and sentence must be reversed. There remains then for our consideration Whaley's conviction on the first count of the information which charged him with receiving stolen goods of a value in excess of $1,000. Inasmuch as the sufficiency of the evidence to sustain that verdict is also challenged, a brief review of the People's evidence is necessary.

The business office of Randy's Meats, Inc. in Arvada

was burglarized by person or persons unknown in the early morning hours of January 30, 1966, which was a Sunday. Entry was gained by breaking a back window. In addition, the company's safe was broken into and approximately $160 and a TV set were missing. Also missing was a refrigerated van truck in which there had been stored over $1,000 worth of frozen food products, including frozen steaks, shrimp and french fries. These items were packaged and bore the following trade names: Randy's Frozen Steaks, Typton Shrimp and L. B. French Fries.

The refrigerated truck was located a few blocks away from the scene of the burglary within a very few hours after the discovery of the burglary. However, all of the frozen food products referred to above had been removed from the truck.

Robert Hudson, hereinafter referred to as Robert, testified that in the early afternoon of January 30, 1966, he received a telephone call from Whaley. Robert had some limited prior acquaintance with Whaley, Robert being a refrigerator serviceman and Whaley a butcher. According to Robert, Whaley stated that he had some frozen foods for sale and inquired as to whether Robert would like to make a purchase of any of the enumerated items. Robert indicated doubt that he wanted to buy, but at the same time indicated that his father, Edwin, might be interested. In any event, Robert and his father shortly thereafter proceeded to drive in separate vehicles to the address given by Whaley.

Hudson's father, Edwin, arrived first. The address given by Whaley was that of the Meadowlark meat market. The Meadowlark incidentally was not the meat market where Whaley was himself employed. Edwin parked at the rear of the Meadowlark, which was closed to the general public, it being a Sunday. Edwin, who was a witness for the People, testified that he and the defendant went into a "backroom" where he picked out the frozen foods which he desired, and for which he paid

Whaley the sum of $56. This witness stated that he noticed the labeling of Randy's Meats on the beef which he purchased. The products thus purchased were then loaded in the witness' automobile and he drove off. Edwin was stopped, however, a very short distance away by police officers who had been conducting a "stake-out" of the Meadowlark.

Similarly, Robert himself arrived at the Meadowlark about the time his father was leaving. Whaley reportedly had stated that he didn't have "any storage room" and desired that Robert store some of the frozen products in refrigerated storage space that Robert maintained. Accordingly, Robert also parked in the rear area of Meadowlark, and he and Whaley loaded more of the frozen food items in the former's pickup truck. This witness also noticed the Randy's meat label on certain of the items placed in his vehicle. Robert then drove off and he too was followed and stopped by the police a short distance away. The police officers conducting the stake-out testified that they then observed Whaley load the trunk of his automobile with packaged items, some of which were observed even from a distance to bear the label of Randy's Meats. The police then followed Whaley as he drove off and stopped him after he too had gone only a very short distance.

Representatives of Randy's Meats, Inc. were called to the place where the three vehicles had been stopped and they identified the products taken from Whaley's car, as well as the items removed from the two other vehicles, as belonging to Randy's Meats, Inc., and bearing its labels. An inventory of the products thus taken but ultimately recovered established a value of $1,011.

As Whaley was being taken to jail he made some inquiry of the police officer as to what charges were going to be filed against him. The officer testified that when he informed Whaley that the charges were to be "burglary and receiving" Whaley replied: "Well I don't see burglary but I do see receiving."

■■■ Whaley contends that there is insufficient evidence to sustain his conviction for the crime of receiving stolen goods. In this regard it is conceded by counsel that Whaley did in fact have stolen goods in his possession, but counsel argues that there is no evidence that Whaley *knew* that the various items which he had in his possession had in fact been "feloniously stolen, taken and carried away" from Randy's Meats, Inc. It is perhaps true that there was no so-called direct evidence bearing on this point, though Whaley's admission against interest certainly constituted some evidence of guilty knowledge. But in any event guilty knowledge may also be established by circumstantial evidence, as indeed it generally is. *Burnham v. People,* 104 Colo. 472, 93 P.2d 899. Our analysis of the People's evidence convinces us that there are such facts and circumstances, coupled with Whaley's admission, as would justify the jury in inferring that Whaley knew he was dealing with stolen property. No testimony was offered by Whaley or anyone else in his behalf. Under such circumstances Whaley is now in no position to complain because the jury drew inferences which were unfavorable to him but nonetheless were warranted by the evidence. *Schamber v. People,* 159 Colo. 102, 410 P.2d 514.

■■ Much is sought to be made of the admission into evidence of People's Exhibit Q, which was a package of Randy's meat. The testimony of the police officer who identified the exhibit was stricken upon motion, but the exhibit was inadvertently received into evidence and viewed by the jury. Actually the trial court erred in striking the testimony of this particular witness; furthermore the exhibit was sufficiently identified by another witness to warrant its reception into evidence. And in any event, we are unable to perceive how any possible error resulting from the fact that the jury was permitted to view one of the products of Randy's Meats could be deemed prejudicial.

The argument that the information was defective and

should have been dismissed because the person making the supporting affidavit did not have personal knowledge of all the facts giving rise to the prosecution is without merit. *People v. Read,* 132 Colo. 390, 288 P.2d 347.

One matter briefly touched on by counsel concerns the refusal of the trial court to compel a police officer called as a witness by the People to divulge the name of a confidential informant. This particular witness testified that about 5 o'clock in the morning on the day in question he received a telephone call from a person known to him who informed him that Randy's Meats, Inc. had been burglarized and also advised him where the stolen food items could be found. As a result of this telephone call the police, after verifying that a burglary had in fact occurred, set up the stake-out referred to.

 It was in this setting then that counsel for Whaley on cross-examination attempted to ascertain the name of the informant. The trial court sustained the objection to this question and under the circumstances we perceive no error in this regard. It is to be emphasized that Whaley in no way attempts to put in issue the legality of his arrest or the lawfulness of the search and seizure that followed. This then is not the case of an arrest based solely on information given by an informer of unknown reliability. On the contrary, as a result of the information given the police by the informant the police made no immediate arrest. Rather, after confirming the fact that a burglary had occurred, they continued their investigation by setting up a stake-out, and the subsequent arrest occurred only after a viewing by the police of the various activities in and around the Meadowlark meat market. Under such circumstances the police indeed had probable cause to arrest Whaley without a warrant and the subsequent search and seizure was a lawful incident thereto. *Moore v. People,* 164 Colo. 222, 434 P.2d 132.

 With the legality of Whaley's arrest and the lawfulness of his search and seizure not being in any manner

placed in issue, the question as to whether counsel had a right to ascertain upon cross-examination the name of the police officer's informant is one to be resolved under traditional rules of evidence. Historically, there has long been a so-called informer's privilege, which is perhaps more accurately labeled the government's privilege to withhold the name of one furnishing information concerning crime to a law enforcement officer so as to encourage citizens to aid in law enforcement by preserving their anonymity. See for example, *People v. Durr*, 28 Ill. 2d 308, 192 N.E.2d 379. For a collation of cases on this subject, see 76 A.L.R.2d 257.

This privilege, however, is not absolute and must give way where the disclosure of the informant's identity is shown to be relevant to the defense or is otherwise essential to a fair determination of the cause. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. In the instant case the attempt to elicit the name of the informer falls well within the government's privilege to withold its disclosure, inasmuch as there is nothing in the record before us to indicate that the name of the informer is in anywise germane to the only real issue in the case, namely, did Whaley know he was handling stolen property. See also *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62.

The judgment is affirmed as regards the conviction for receiving stolen goods, but reversed as to the conviction and sentence on the count charging him with larceny by bailee.

MR. JUSTICE DAY, MR. JUSTICE HODGES and MR. JUSTICE GROVES concur.