STATE OF NORTH CAROLINA v. MASON FREEMAN PARKS

No. 7526SC491

(Filed 17 December 1975)

Constitutional Law § 31— identity of confidential informants — necessity for disclosure

Where two confidential informants introduced an SBI agent to defendant and made a buy of marijuana for the agent from defendant on 30 August, and the agent bought marijuana from defendant on 6 September without the assistance of the informants, disclosure of the identity of the confidential informants in a trial of defendant for the 6 September sale of marijuana was not required since the informants did not participate in that sale.

APPEAL by defendant from *Baley, Judge.* Judgment entered 16 January 1975 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 25 September 1975.

Defendant was indicted for the alleged 6 September 1974 felonious distribution of marijuana to State Bureau of Investigation Agent V. R. Eastman.

According to State's evidence, Agent Eastman went to defendant's Connection Lounge " . . . with the purpose of meetng Mr. Parks and making a purchase of marijuana." At trial, Eastman further recalled that he " . . . went with a confidential source, I do not know the name, to the lounge. They were a male and female. It was through this source that I met Mr. Parks. On August the 30th after a brief conversation of introduction to Mr. Parks, we discussed the price of a pound of

marijuana. . . . [H]e agreed to sell a pound of marijuana but not to myself. He agreed to sell it to a confidential source. . . . After I transferred the money to the confidential source, a substance was given to me by the confidential source. It was a vegetable type substance which was in a dry form and ground up. . . . I [then] had a further conversation with him in regard to the buy of further marijuana. I asked Mr. Parks what the price would be per pound for five pounds of marijuana. I asked him this as I was standing by Mr. Parks and the confidential informer. Mr. Parks said he would sell me five pounds for $175.00 per pound. I advised him that the price was a little steep to be buying five pounds, meaning the price was too high."

"Mr. Parks stated that the quality of the marijuana was of good quality, and he could not reduce the price. . . . [A]s the two confidential informers and myself were leaving the front of the Connection [Lounge], . . . I then asked Mr. Parks or advised Mr. Parks that I would return the next Friday to purchase five pounds, and he agreed and said, O.K."

On Friday, 6 September 1974, Eastman returned by himself to the defendant's lounge and testified that:

" . . . Mason Parks was at the lounge when I arrived. I arrived at the lounge and after my arrival, I went inside at the bar and ordered a beer. I then took the beer and went to a booth which was located inside the lounge. I sat down one booth over from Mr. Parks and an unknown white male that he was talking to. After sitting there for a few minutes, the other male left Mr. Parks' presence. I then advised Mr. Parks to have a seat, asked him if he would have a seat in my booth, and he did.

After he sat there for a few minutes, I introduced myself again, and he advised me he remembered me from the last week. I introduced myself as Ray Eason. I asked Mr. Parks if he had the five pounds that I requested on August 30. Mr. Parks advised me that he did not know me, and that he didn't want to deal with anybody that he did not know. After a few seconds, I advised Mr. Parks that I had come to the Connection Lounge with the intent of buying five pounds of marijuana. I stated that I had people who were expecting parts of the five pounds on the same evening. Mr. Parks then stated that, or I then stated to Mr. Parks, that I had the entire amount of money to purchase

five pounds of marijuana. Mr. Parks then advised me that he would deal with me, but if I was an informer or working for the police, that he would have me done away with. At that point I advised Mr. Parks that I felt the same way about informers or people working for the police. Mr. Parks then agreed to sell me five pounds of marijuana, and we began a discussion about the price. After arguing over the price of $175 per pound, Mr. Parks agreed to sell me five pounds of marijuana for $850, being approximately $170 per pound, I think. I then handed Mr. Parks $850 in United States currency. He left my presence and went into his office and returned in a few minutes and stated that he would have to go about a block away to pick up the five pounds.

To the best of my knowledge, the $850 was broken down into two $100 bills and the rest was in $20 bills, and perhaps one $10. He was in his office approximately five to ten minutes. When he came out, he advised me to accompany him outside. On the way out, he asked me if I had a vehicle, and I informed him that I did, and he advised that we would take my vehicle to pick up the marijuana. I was operating a '74 Continental Pontiac. It was green with a light green top. We then drove north on Tryon Street approximately a block and a half. No one was in the car besides Mr. Parks and myself, and I was driving. We went up to the Bowens A & G Store. It was at the intersection of Tryon Street and Eastway. We arrived and parked beside the store and sat there for approximately fifteen minutes in a parking lot. It was approximately 8:25 when we arrived at the Bowens Store. While we were there, the party that we were supposed to have met did not arrive at that time. Mr. Parks and myself engaged in a conversation and during that conversation, Mr. Parks advised me about the marijuana. He advised me about the use of marijuana and stated that he believed there wasn't anything wrong with marijuana and he said that he used marijuana. He said he used marijuana as a sexual stimulant during intercourse, and he further stated he did not see anything wrong with the use of marijuana or with the sale of marijuana.

A. I then asked Mr. Parks if he sold any other type drugs. Mr. Parks stated that he did. . . . I asked him about the price of cocaine and he stated that he sold cocaine for fourteen

hundred dollars per ounce . . . . and seven hundred and fifty dollars per half ounce. At that time I agreed with Mr. Parks as to the price and agreed to contact him later on, after I had gotten money together to buy the ounce of cocaine, or half ounce of cocaine. . . .

I would say we sat in the parking lot of the A & G Store with Mr. Parks for approximately twelve to fifteen minutes. After the party that we were supposed to have met didn't show up, Mr. Parks advised me to return to the Connection Lounge which I did. I hadn't gotten out of the car at any time while I was at the parking lot. And he didn't get out of the car until we got back to the Connection Lounge. Neither of us got out of the car from the time I left the lounge at around 8:25 until I returned to the lounge which would have been around twenty minutes of nine. At that time, Mr. Parks went inside the lounge and during the time he was inside the lounge, two ABC officers came up in State type vehicle. They went inside and came outside. One of them was looking around the outside of the premises. I was still in my car behind the driver's portion. Mr. Parks returned to the vehicle in approximately ten to twelve minutes, and I asked him who the gentlemen were in the vehicle that was parked in front of the lounge. He said they were ABC officers and they had a job to do and they were checking his place for ABC violations. He did not indicate to me in those words who operated the Connection Lounge. When he returned to the car he advised me that we would return to the same parking lot, which we did. We stayed there for approximately five to seven minutes, and in a few minutes, a white over red '73 Eldorado Cadillac arrived occupied by one white female and a shaggy dog. Mr. Parks advised me to open my trunk, which I did. At that time, he was in the process of getting out of the right side of my vehicle. I didn't see anybody else in the parking lot when the white over red Cadillac drove up. It was a white convertible top over a red body. The driver was a white female with long brownish type hair. After Parks told me to open the trunk, I did so, and Mr. Parks went to the red and white Cadillac, opened the door and reached behind the driver's seat and he grasped five white plastic bags in his hand and brought them over to my vehicle and put them in my trunk. The Cadillac was approximately twelve to fifteen feet from my car. He brought all the bags at one

time. I didn't open the bags. The bags were placed in the trunk of my vehicle.

Also in my trunk at that time were a couple of boxes and my police SBI radio was in the back seat. It was covered at the time in the back in the trunk of my car. The bags were placed together in the trunk of my car. As I said before, Mr. Parks placed them himself in the trunk of the car. Mr. Parks then wished me a farewell and said, 'I'll see you again later,' and I said, 'O.K., goodnight,' and left the area."

Eastman immediately took the suspected contraband to Special Agent Ross waiting at a nearby motel and the purchased material was properly channeled and tagged throughout police custody. According to the State Crime Laboratory Chemist, the substance allegedly purchased from the defendant on 6 September 1974 contained tetrahydrocannabinal, the active ingredient normally found in marijuana.

Defendant maintained that neither on 30 August nor 6 September 1974 did he ever arrange with Eastman for the sale of marijuana. Defendant testified that he stayed home on 6 September 1974 with his son, helping the child prepare his football gear for an upcoming game. The son and business partner both corroborated defendant's alibi.

From a plea of not guilty, the jury returned a verdict of guilty. Sentenced to a term of imprisonment, defendant appealed.

*Attorney General Edmisten, by Assistant Attorney General Charles J. Murray, for the State.*

*James, Williams, McElroy & Diehl, P.A., by William K. Diehl, Jr., for defendant appellant.*

MORRIS, Judge.

Defendant, citing as error the failure of the trial court to require disclosure of the identity of the confidential informers involved in the purported 30 August 1974 meeting and drug transaction, maintains that disclosure was necessary for the effective presentation of his alibi defense and his related contention of misidentification.

The United States Supreme Court, though recognizing the government's privilege of informant nondisclosure, noted the counterbalancing principle that disclosure is warranted where informant identity is " . . . relevant and helpful to the defense of an accused, or is essential for a fair determination of a cause. . . . " *Roviaro v. United States,* 353 U.S. 53, 60-61, 1 L.Ed. 2d 639, 77 S.Ct. 623 (1957); also see *McLawhorn v. State of North Carolina,* 484 F. 2d 1, 5 (4th Cir. 1973); *State v. Cameron,* 283 N.C. 191, 193, 195 S.E. 2d 481 (1973). The Supreme Court, rather than amplify on the details of this basic problem, broadly opined " . . . that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro, supra,* at 62; *McLawhorn, supra,* at 4.

Our Supreme Court, interpreting the *Roviaro* decision, has concluded that *"Roviaro* makes two things clear: (1) There is a distinct need for an informer's privilege but the general rule of nondisclosure is not absolute, and (2) disclosure is required where the informer directly participates in the alleged crime so as to make him a material witness on the issue of guilt or innocence." *State v. Ketchie,* 286 N.C. 387, 390, 211 S.E. 2d 207 (1975). This Court, consistent with our Supreme Court's analysis, will compel disclosure " . . . if it appears that he [*i.e.* the informant] is a participant as opposed to a 'mere tipster.' " *State v. Lisk,* 21 N.C. App. 474, 476, 204 S.E. 2d 868 (1974), cert. denied 285 N.C. 666 (1974). Also see *McLawhorn, supra* at pp. 5-6. Whether the informant is a participant or a "mere tipster" turns, at least partially, on the " . . . qualification of the informant to testify directly concerning *the very transaction constituting the crime."* (Emphasis supplied.) *McLawhorn, supra,* at p. 5. If the informant can testify as to the details surrounding the *actual* crime, then the defendant should be given the opportunity to test his credibility as a witness.

In this case, the informants purportedly accompanied Agent Eastman to the defendant's Connection Lounge on 30 August 1974 and allegedly made the "buy" for Eastman. However, defendant was not charged with the felonious distribution of drugs

on 30 August, but rather, stood on trial for the illegal and felonious sale of five pounds of marijuana on 6 September 1974 to Agent Eastman. Defendant dealt only with Eastman with respect to the 6 September "deal" and the informants never participated in the negotiation or actual culmination of the purported unlawful transaction. Without question, the informants provided Eastman with the necessary entree to defendant's purported drug business, but once the course of dealing was established on 30 August 1974 and defendant felt confident that he was dealing with a safe buyer, the relationship became one uniquely personal between defendant and Eastman.

We are familiar with the California Supreme Court's decisions in *People v. Durazo,* 52 Cal. 2d 354, 340 P. 2d 594 (1959), and *People v. Williams,* 51 Cal. 2d 355, 333 P. 2d 19 (1958), but we consider their reasoning faulty and illogical and expressly reject their position. In *Durazo* and *Williams* the California Supreme Court held that when a subsequent transaction, even though accomplished without the assistance of the informant, " . . . was consummated in reliance upon the prior one . . . " then disclosure was necessary. *Williams, supra,* at 360. In *Durazo,* Justice Shenk, forcefully dissenting, argued that disclosure was unwarranted because "there was no informant participation." *Durazo, supra,* at 357. We believe Justice Shenk's opinion more accurately reflects the proper application of the law. In North Carolina, participation is the essential factor and when the " . . . unknown person was not present at the time of the actual sale . . . " there is no necessity for revealing the confidential source's name. *State v. Cameron, supra,* at 194.

Here, the officer was sure and certain of his identification. It was not based on an observation lasting just a few minutes; he was in the presence of defendant for almost an hour. Most of that time the two were alone and engaged in face to face conversation. Felony narcotics violations appear to be increasing at a rather alarming rate. Because of the nature of the crime, the use of informers has to play a major role in the apprehension and conviction of narcotics violators. Further extension of the rule with respect to disclosure of the name of the informer could well result in the elimination of the use of informers and, correspondingly, ineffective law enforcement in the area of narcotics violations. To adopt the majority rule in *Durazo* and *Williams* would result in requiring disclosure of the informer's name in almost every case where the defendant claims he is

"not the man." This we are unwilling to do, especially, where, as here, there was positive, direct, face to face testimony of the arresting officer that defendant was "the man," and the informer had nothing to do with the transaction for which defendant was arrested.

No error.

Judges HEDRICK and ARNOLD concur.