THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LUTHER AVERY, Defendant-Appellant.

First District (3rd Division)    No. 76-885

Opinion filed June 21, 1978.

Sam Adam, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Luther Avery, was found guilty of the delivery of a controlled substance, heroin (Ill. Rev. Stat. 1973, ch. 56½, par. 1401(a)) following a bench trial. He was sentenced to 8 to 20 years in the Illinois Department of Corrections. On appeal, the defendant contends that he was denied his right to a fair trial and to summon witnesses in his behalf when his attorney was denied access to a crucial defense witness, William Hoskins.

The defendant was arrested on May 2, 1974, at the Cermak Shopping Center at 22nd Street and Harlem Avenue in Cicero while sitting in a car in the shopping center parking lot with Nathan Tindall, a special agent with the Illinois Bureau of Investigation (IBI). The defendant, testifying in his own behalf, admitted that he gave Tindall a brown paper bag containing a number of small plastic bags filled with chunks of some substance. He did not look in the paper bag before he handed it over, nor did he know for certain what was in the plastic bags. He thought he was giving Tindall "milk sugar" as part of a scheme he and William Hoskins, whom the defendant had known since childhood, had prearranged to "rip-off" the IBI agent. He testified that another man, Arthur Villiasonor, also known as Joseph Reyes, also known as "Eyes," was also arrested at the shopping center in connection with this transaction. While the defendant was being arrested, he saw police take a third man, whom he recognized as Hoskins, into custody. However, three witnesses for the State (two IBI agents and an Assistant State's Attorney) testified that Hoskins was arrested on the same night as the defendant and Villiasonor but at his home, not at the shopping center. They also testified that Hoskins' arrest was unrelated to the transaction between the defendant and agent Tindall. Other testimony adduced at trial showed that Hoskins had signed a consent to arrest form and was arrested to provide a cover story to protect him from the defendant. The arresting officer had died prior to trial.

The parties agree that the transaction of May 2, 1974, was the culmination of at least two weeks of negotiations between the defendant and agent Tindall. Tindall testified that he had asked William Hoskins to introduce him to the defendant and to set up a heroin purchase, and Hoskins introduced him to the defendant on March 11, 1974. Hoskins had been giving the IBI information concerning the defendant since

December 1973, and once had given the IBI drugs which he claimed to have received from the defendant.

Tindall contacted the defendant on numerous occasions following their initial meeting to arrange a drug purchase. These conversations were, for the most part, secretly recorded pursuant to authorization from the Cook County State's Attorney. The conversations related to a narcotics transaction wherein the defendant would deliver 12 ounces of heroin to Tindall for $12,500. The sale was to take place on April 25, 1974, at 1030 North Milwaukee Avenue. That deal was postponed until the following morning, when the "man" with the drugs failed to show up. Thereafter, agent Tindall feigned reluctance to continue his attempts to deal with the defendant, claiming that the person putting up the money for the deal wanted to back down, but finally agreed to plans for delivery of the heroin on May 2, 1974, at the Cermak Shopping Center. Agent Tindall, wired with a listening device and accompanied by a female agent, Joyce Jones, who had been introduced as his girlfriend, met the defendant at 7:30 p.m. at the Lady J Lounge where they spoke briefly and left in separate cars for the shopping center. When they arrived at the shopping center, Tindall left agent Jones in his car and entered the defendant's car. The defendant asked Tindall for the money, but Tindall refused to hand it over until he saw the heroin. The defendant told Tindall that he had to pick up the drugs and proceeded to a Walgreen Drug Store located at the other side of the parking lot.

Tindall testified that the defendant returned about five minutes later carrying a brown paper bag, and the two of them sat in Avery's car while they examined the contents. There were small plastic bags containing brown powder with chunks in it, which chemical analysis later proved to be heroin. When they had counted 12 bags, by prearranged signal Tindall emerged from the car supposedly to get the money he owed and IBI agents surrounded the car and arrested the defendant.

The defendant testified that Hoskins met him at his home after work on May 2. Hoskins said he had the "milk sugar" but did not want to be present during the delivery. He told the defendant that he (Hoskins) had to meet a Mexican known as "Eyes" in Berwyn, and that the defendant should meet Hoskins at Walgreens in the shopping center. After stopping at the Lady J Lounge to meet Tindall, the defendant proceeded to the shopping center, followed in another car by Tindall. The defendant testified that Hoskins and a Mexican man he did not know met him in Walgreens. Hoskins told the defendant to follow the Mexican whom he called "Eyes" who would give him a package, and to be sure to get the money from Tindall, reassuring the defendant that there would be nothing but milk sugar in the package. The defendant followed "Eyes" to a blue car, where "Eyes" reached into the back seat and pulled out a bag

which he handed to the defendant. The defendant then returned to his car and gave the bag to Tindall, who counted nine bags. According to the defendant, Tindall was upset because there were only nine bags, not 12, and jumped out of the car. At that point, IBI agents surrounded the car and the defendant was arrested. The defendant testified further that a few minutes later, he saw Hoskins and "Eyes" being taken out of the blue car and being placed in a grey (State) car. He stated that he saw Hoskins at IBI headquarters later that night, and Hoskins said, "This is all my fault". When the defendant told him the agent got nothing but milk sugar, Hoskins looked at him "right funny." Hoskins told the defendant that he was also under arrest, but according to the defendant, his arrest sheet looked different from that of Hoskins.

Several other IBI agents testified regarding the defendant's movements at the shopping center. Agent Michael Figueroa testified that he saw the defendant leave his car and proceed south to Walgreens where he remained in front for a moment, and then walked out into the parking area out of his view. When he saw the defendant he was walking back toward his car carrying a brown paper bag.

Special Agent Joseph Grady testified that he stood on the sidewalk immediately west of the drug store, approximately 40 feet west of the entrance. He saw the defendant enter Walgreens alone and stand near the front of the store. The defendant was out of view for part of this time, but Grady periodically looked into the window to watch the defendant. He did not see anyone join him. When the defendant left Walgreens empty-handed, he went north through the lot to the blue Buick where he stayed for about a minute before returning to his own car.

Special Agent Charles Doerr testified that he saw the defendant walk towards the drug store, but could not see the entrance to Walgreens from his vantage point. He could see Arthur Villiasonor ("Eyes") and testified that Villiasonor never left his car during the time he was watching him.

Agent Edward Rodek testified that he was parked very close to Walgreens and saw both the defendant and Villiasonor arrive. Villiasonor pulled into the parking space directly behind Rodek's car. Rodek saw the defendant enter Walgreens and remain inside near the front window of the pharmacy for a couple of minutes. While he occasionally lost sight of the defendant when he turned to watch Villiasonor, Rodek did not see anyone speak to the defendant, although there were other people in the vicinity. The defendant then went to the blue Buick, entered on the passenger side, and left carrying a bag. Rodek arrested Villiasonor a few minutes after.

At a preliminary hearing, defense counsel moved that the State be required to produce any informants involved in the May 2, 1974, transaction for trial and furnish the defendant with the names and

addresses of the informants. Counsel for the defendant based this motion upon his understanding through newspaper articles, police reports and his own investigation that two other persons, William Hoskins and Joseph Reyes, a/k/a Arthur Villiasonor, had been arrested at the shopping center on May 2 for delivery of heroin. It was also his understanding that these charges had subsequently been dropped. The State denied that any informant had been involved in the May 2 transaction or arrangements therefor in any way whatsoever. No ruling was made on the motion at this stage, and it was renewed at trial. The State at trial reasserted its position that neither Reyes nor Hoskins was involved, and the motion was denied. The State then offered to supply the last known addresses of the two individuals and was ordered by the court to do so.

At trial, during the cross-examination of agent Tindall, defense counsel renewed his motion to produce the informants. He offered to bring in a newspaper reporter who had written an article based on an IBI press release which indicated that Hoskins had been arrested on May 2, 1974, and charged with possession of heroin, the same heroin sold at the shopping center by the defendant. Defense counsel stated further that the heroin sold in this case was given to Reyes (Villiasonor) by Hoskins who switched it with the package of brown sugar which the defendant thought he would be selling to Tindall according to the scheme he and Hoskins allegedly devised. The court stated that the defendant had proved that Hoskins was in fact an informer, but had not established that Hoskins was the type of informer that he was entitled to have produced.

Defense counsel again renewed his motion to produce Hoskins and any and all files regarding both Hoskins and Villiasonor. The motion was denied because of its untimeliness and lack of materiality.

During the course of the trial on May 26, 1976, defense counsel discovered Hoskins' whereabouts and served him with a subpoena to appear as a defense witness at 9 a.m. the following day. On May 27, 1976, at approximately 11:30 a.m., the State informed the court that they had Hoskins in the building, but that he was not a material or necessary witness to the proceeding. The State's Attorney stated that an *in camera* hearing was the very most he could allow because "revealing the identity of the informant is very dangerous in a narcotics situation." The court treated the State's motion to quash the subpoena as one to limit the content of Hoskins' testimony due to his position as an informer. Since the court had already examined the IBI files on Hoskins and found nothing to indicate any involvement in the transaction at trial, the court suggested that defense counsel and the State's Attorney speak with Hoskins to determine if something was missing from the IBI file which would indicate Hoskins' involvement in the matter. If so, he would be allowed to testify. The court allowed defense counsel 15 minutes after the lunch

recess to speak with Hoskins in the presence of the State's Attorney to determine whether his testimony would be material. However, due to a prior commitment of which the court was aware, the defendant's attorney was unable to meet with Hoskins. He did meet with Hoskins in the State's Attorney's office after the court had recessed for the day, and served Hoskins with a second subpoena.

On May 28, 1976, a press release previously issued by Wayne Kersteder, Superintendent of the IBI, concerning the May 2, 1974, transaction which stated that Hoskins was arrested at the shopping center for delivery of heroin, was entered into evidence. However, an attorney for the IBI stated that Kersteder had no independent recollection of the incident. The State then moved to quash the second subpoena served on Hoskins. However, the court reiterated its ruling that Hoskins could testify only if the defendant would file an affidavit from Hoskins indicating that his testimony would support the defendant's theory of Hoskins' involvement in the matter.

Following the defendant's testimony on his own behalf, the State's Attorney indicated that since Hoskins' identity had already been revealed to the court, he would have no objection to the defendant reopening his case to call Hoskins to testify at that time. However, defense counsel responded that he had sought to have Hoskins produced earlier, before the State had an opportunity to speak with him and before the defendant had testified, and that he was of no use to the defendant so late in the case.

The defendant argues that prosecutorial interference with his access to a crucial defense witness, Hoskins, which interference served no legitimate interest of either the State or the witness, denied him a fair trial and the right to summon witnesses on his behalf.

■■ The evidentiary principle known as the informer's privilege is actually the government's privilege to withhold the identity of persons who furnish information about violations of law to law enforcement officials. In Illinois, the rule is stated as an exception to the State's discovery obligations:

> "* * * Disclosure of an informant's identity shall not be required where his identity is a prosecution secret and a failure to disclose will not infringe the constitutional rights of the accused. * * *." Ill. Rev. Stat. 1975, ch. 110A, par. 412(j)(ii).

■■ However, the scope of this privilege is limited by its underlying purpose—the protection of the public interest in effective law enforcement, and by the fundamental requirements of fairness. (*Roviaro v. United States* (1957), 353 U.S. 53, 59-60, 1 L. Ed. 2d 639, 644-45, 77 S. Ct. 623.) Thus, "once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is

no longer applicable." *Roviaro*, 353 U.S. 53, 60, 1 L. Ed. 2d 639, 644-45, 77 S. Ct. 623.

■■  While the State initially denied that any informant was involved in the defendant's case, testimony of both the State's witnesses and the defendant at trial showed Hoskins' status as an informer. The defendant had known Hoskins since childhood and had also seen him between the time of his arrest and trial, when he had known of his status. In light of these facts, the informer privilege is no longer applicable.

■■  The right of an accused to have compulsory process for obtaining witnesses in his favor guaranteed by the sixth amendment of the United States Constitution is applicable to the States through the fourteenth amendment. (*Washington v. Texas* (1967), 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 87 S. Ct. 1920.)

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. * * * This right is a fundamental element of due process of law." *Washington*, 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920.

In the case at bar, the State not only initially denied any knowledge of Hoskins and then later denied that he had been a participant at the shopping center itself, but once Hoskins' role in introducing the defendant to agent Tindall to set up the drug sale had been shown at trial, interfered with the defendant's subpoena of Hoskins, holding Hoskins in the State's Attorney's office instead of allowing him to go to court pursuant to the subpoena. It was only after the defendant had testified in his own behalf that the State suddenly withdrew its objection to the production of Hoskins. The State noted that since Hoskins' identity obviously had been brought to the court's attention, it would waive its previous objections, and the defendant could reopen his case for purposes of calling Hoskins. However, the defendant had already been forced to waive his constitutional right not to take the stand in his own defense. The State had been informed that the defendant's defense would be that he was involved in a scheme which to his knowledge did not involve drugs, and that Hoskins was the one who switched packages so that the defendant in fact turned over a package of heroin instead of milk sugar to Tindall. The fact that the defendant was faced with the burden of explaining his alleged delivery of the heroin emphasizes his vital need for access to any material witness. The only person, other than the defendant, who could controvert, explain or amplify the alleged scheme he and the defendant had contrived was Hoskins. This is similar to the situation in

*United States v. Godkins* (5th Cir. 1976), 527 F.2d 1321, where the court considered the district court's denial of the defendant's right to subpoena a witness already known to him, who was present at the time of the alleged sale, and who had introduced the defendant to the special agent who allegedly completed the purchase. There the court stated:

"We have found no case which authorizes a trial court to restrict the right of an accused person to subpoena any witness already known by him to give relevant testimony simply because by questioning such witness he may be uncovered as an informer." (*Godkins*, at 1326.)

Thus, the limitation on a criminal defendant's sixth amendment right to call a witness whose testimony could have a bearing on his defense when that witness is an unknown government informer, enunciated in *Roviaro*, was not applicable.

Similarly, that limitation is inapplicable to the case at bar. In light of the fact that the defendant already knew Hoskins, it was "unfair to refuse to afford a defendant the opportunity of deciding for himself whether or not the informer could provide testimony helpful to the defense." (*People v. Lewis* (1974), 57 Ill. 2d 232, 237, 311 N.E.2d 685; see also *People v. Williams* (1968), 40 Ill. 2d 367, 240 N.E.2d 580.) The State's last minute change of heart could not rectify the prejudicial interference with the defendant's right to call witnesses on his behalf and with his decision whether or not to testify himself, and only served to bolster the impression that it was intentionally frustrating the defense.

■■ We find that the actions of the State's Attorney in obstructing the defendant's attempts to locate Hoskins and verify his course of conduct, and the refusal of the trial court to permit the defendant to call Hoskins as a witness constituted reversible error.

For the reasons above stated, the judgment of the circuit court of Cook County is reversed and the case remanded for a new trial.

Reversed and remanded.

McNAMARA and McGILLICUDDY, JJ., concur.