[No. 14693–9–I. Division One. July 21, 1986.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIE
HARRIS, *Appellant*.

*Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Rexanne Gibson, Deputy,* for respondent.

SCHOLFIELD, C.J.—Willie Harris appeals his conviction of two counts of violation of the Uniform Controlled Substances Act, one count for possession of heroin with intent to deliver, and the other for possession of cocaine with intent to deliver. We affirm.

## FACTS

On June 16, 1977, approximately eight Seattle police officers executed a search warrant at Harris' residence. In the affidavit supporting the search warrant, Detective Sgt. Joe Sanford stated that an informant had been inside Harris' residence in the previous 24 hours and had observed Harris sell a quantity of narcotics to a buyer. Detective Sanford further alleged that he had known the informant for 70 days, and that during that time the informant had given information regarding narcotics trafficking that had been corroborated and proved to be reliable.

Upon execution of the warrant, Detective Sanford found Harris standing in front of the kitchen sink, holding a plastic bag containing a powder, later found to be cocaine. The officer seated Harris on the living room couch. Several teenage girls were present in the house, and the officers placed them in the living room as well. Harris was observed leaning forward toward the coffee table while sitting on the couch and fumbling with his hands near his ankles. A detective, noting this activity, removed a Kleenex containing small balloons from Harris' sock and one from under-

neath the coffee table. The contents of the balloons were tested and found to be heroin. On the coffee table, the officers found more balloons, a mirror, coke spoons, coke straws, and a card.

Harris' version of these events is significantly different from the testimony of the officers. Harris testified that he had snorted cocaine on the previous day, but at the time the police searched, no cocaine was present. Harris claimed that the balloons containing heroin were brought in by the police in an effort to frame him, and that in fact, he was not wearing any socks in which he might have hidden balloons.

Prior to trial, Harris moved to require the State to disclose the informant's identity, or in the alternative, for an in camera hearing on disclosure of the informant.

In the affidavit supporting his motion, Harris denied selling narcotics and questioned the existence of the informant. Harris also alleged that the police acted with "reckless disregard for the truth" concerning the informant's statements.

Harris presented the testimony of several witnesses to support his contention that the informant could not have seen a sale of narcotics in his home in the 24 hours prior to the issuance and execution of the search warrant on June 16, 1977. William Sanders, a/k/a Dick Haines, who was present in the Harris home when the police executed the search warrant, testified he had been staying with Harris for several days prior to the 16th of June and that at no time on June 15 or 16 did he see narcotics or drugs of any kind in the Harris residence. He admitted he was asleep during part of each day.

Robert Sims testified that he arrived at the Harris house around 6 p.m. on the 15th and stayed until around 5 a.m. on the 16th. He testified that he did not observe any narcotics at Harris' home during that time, nor did he observe any narcotics being sold.

William Smith testified that at approximately 11:30 p.m. on June 15, he brought an acquaintance named Steve to the

Harris residence. Smith testified further that Steve began to talk to Harris about buying or selling cocaine, and that Harris became upset. Smith stated that he did not see any cocaine present that evening when Steve was there, nor when Smith returned later around 3 a.m.

The court denied the motion to suppress the physical evidence obtained through the search warrant and also denied the motion to disclose the informant's identity and the alternative motion for an in camera examination. Following these unfavorable results on the pretrial motions, Harris fled the state and failed to appear for trial. Harris was arrested in California in 1983, approximately 6 years later.

At trial in 1984, Sonia Acrey, one of the girls present during the execution of the search warrant, testified to corroborate Harris' story. The defense unsuccessfully tried to limit impeachment of Acrey to the fact that she had been convicted of four felonies. For strategic reasons, the defense brought out the information that Acrey was convicted of burglary in the second degree, attempted robbery in the first degree with a firearm, robbery in the first degree with a firearm, and robbery in the second degree. All of these convictions occurred since 1977.

At the end of the trial, Harris moved to dismiss, arguing that the State had not proven that heroin and cocaine were controlled substances. He objected to certain of the court's instructions in that regard. Harris was found guilty on both counts.

### FAILURE TO HOLD AN IN CAMERA HEARING REGARDING IDENTITY OF THE INFORMANT

The law on this issue is well stated in *State v. Harris,* 91 Wn.2d 145, 148, 588 P.2d 720 (1978):

> The privilege of the government to withhold from disclosure the identity of police informers is known as the "informers' privilege". It is recognized in this state by both statute and court rule. RCW 5.60.060(5); CrR 4.7(f)(2). According to the leading United States Supreme Court decision on the informers' privilege, its

purpose is to encourage citizens to communicate their knowledge to police in order to further and protect the public interest in law enforcement. *Roviaro v. United States,* 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623 (1957) (hereinafter referred to as *Roviaro*). The privilege is not absolute, and if disclosure of an informer's identity "is relevant and helpful to the defense . . . or is essential to a fair determination of the cause, the privilege must give way. In these situations, the trial court may require disclosure." *Roviaro, supra* at 60–61.

█ The case for disclosure is much stronger when it appears likely that identifying the informant will be helpful in the determination of guilt or innocence. Cases such as *Roviaro v. United States,* 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623 (1957), *State v. Harris, supra,* and *State v. Allen,* 27 Wn. App. 41, 615 P.2d 526 (1980) can be distinguished from the case before us because in all of them there was a basis for treating the informant as a material witness at trial.

That is not the case here. Harris' description of events during execution of the search warrant goes no further than to contradict the testimony of the officers who assisted in the execution of the warrant. Harris' claim that the police framed him rests entirely on his testimony and that of his witnesses. The informant was not present when the warrant was executed, and no showing was made that the informant could have offered any testimony material to the issue of Harris' guilt. *See State v. Smith,* 101 Wn.2d 36, 677 P.2d 100 (1984) (informant in a drug buy not required to be produced to testify regarding defendant's entrapment defense, when he failed to make a prima facie showing of the defense).

In *McCray v. Illinois,* 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056 (1967), the Court rejected the notion that the defendant has a constitutional right to the identity of the informant if the issue is probable cause only. However, the Washington Supreme Court, in *State v. Casal,* 103 Wn.2d 812, 699 P.2d 1234 (1985), ordered an in camera hearing where the defendant's affidavit asserted, based on alleged

conversation with the informant, that the affidavit support-
ing the search warrant contained material misrepresenta-
tions by the affiant.

Testimony of witnesses offered by Harris in support of
his motion to require disclosure amounts to nothing more
than a denial that any drug transaction could have taken
place in Harris' residence during the time the informant is
alleged to have witnessed such a transaction. This evidence
attacks the informant's credibility or accuracy, but only by
giving evidence to the contrary. There is nothing in the
testimony that is material to the issue of the credibility of
Detective Sgt. Joe Sanford, the officer who signed the affi-
davit.

We conclude that the testimony of the witnesses in sup-
port of Harris' motion, limited as it is to the probable cause
issue, falls short of the substantial preliminary showing
necessary to require an in camera hearing or disclosure of
the informant's identity.

Even if the testimony of the defense witnesses was
accurate, it would not operate to impeach the credibility of
Detective Sanford, who was entitled to rely upon informa-
tion from an informant whom he had found to be reliable
in earlier transactions. The trial court did not err in deny-
ing Harris' motion for disclosure of the informant and in
the alternative for an in camera hearing.

This assignment of error must be rejected on the addi-
tional ground that approximately 9 years have gone by
since the search warrant involved in this case was executed.
Approximately 6 years of that delay is directly due to Har-
ris' failure to appear for trial and absenting himself from
the state following denial of his pretrial motions. After such
a long delay, it is extremely doubtful that a remand could
accomplish anything, even if it was otherwise appropriate.
In the interest of justice, we would affirm the trial court's
denial of Harris' motion on that ground alone.

### IMPEACHMENT OF DEFENSE WITNESS

Harris assigns error to admission of four prior convictions

for burglary and robbery for the purpose of impeaching defense witness, Sonia Acrey. He contends the trial judge erred in not undergoing the analysis prescribed in *State v. Alexis,* 95 Wn.2d 15, 621 P.2d 1269 (1980). The reasoning in *Alexis* was strongly influenced by the fact that Alexis was the *defendant.* The considerations involved in impeaching a witness are different because the ruling is unlikely to influence the defendant's decision to testify or not testify. Furthermore, there is less risk of prejudice to the defendant when a defense witness is impeached because it is unlikely a jury would infer the defendant's guilt because a witness has a criminal record. *United States v. Lipscomb,* 702 F.2d 1049 (D.C. Cir. 1983). The convictions involved here all occurred since 1977, the nature of the offenses was relevant and material to the credibility issue, and credibility of the witness was directly involved because Acrey's testimony supported Harris' claim of a police frame–up.

As in *Alexis,* the court was dealing with admissibility of prior convictions of a *defendant* in its decision in *State v. Jones,* 101 Wn.2d 113, 677 P.2d 131 (1984). *Jones* requires the trial court to state its reasons for admitting or excluding prior convictions of a *defendant.* We have no rule or case authority imposing the same requirement where the impeachment is of a nonparty witness. ER 609(a), however, applies to impeachment of a "witness" and calls for a determination "that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant" unless the prior offense involved dishonesty or false statement. Thus, while the requirements of the rule apply to impeachment of a nonparty witness, trial court error in failing to weigh probative value against prejudice on the record does not impact a constitutional right of the defendant.

Under these circumstances, the test for harmless error is whether, within reasonable probabilities, the error materially affected the outcome of the trial. *State v. Crenshaw,* 98 Wn.2d 789, 800, 659 P.2d 488 (1983).

The error here, if any, was harmless. Evidence of guilt was strong. Harris testified in his own defense. Furthermore, Harris' motion was to limit the impeachment of Acrey by referring to her prior convictions as four felonies. We view it as highly unlikely that adding the type of offenses involved would materially affect the result in this case.

### Instruction That Cocaine Is a Controlled Substance

Harris assigns error to the trial court's instruction that cocaine was a controlled substance, contending that such an instruction was a comment on the evidence, because RCW 69.50.206(b)(4) does not specifically list cocaine as a controlled substance:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine.

RCW 69.50.206(a) provides:

> The drugs and other substances listed in this section, by whatever official name, common or usual name, chemical name, or brand name designated, are included in Schedule II.

█ █ The trial court is permitted to take judicial notice of all information contained in the public statutes of this state. *Gross v. Lynnwood,* 90 Wn.2d 395, 397, 583 P.2d 1197, 96 A.L.R.3d 187 (1978). Cocaine is the common name for the salt of coca leaves. It follows that RCW 69.50.206 lists cocaine as a controlled substance. Determining what substances are listed as controlled substances is a matter of statutory interpretation. The trial court did not err in instructing the jury as a matter of law that cocaine is a controlled substance.

In support of his argument, Harris cites *State v. Barringer,* 32 Wn. App. 882, 888, 650 P.2d 1129 (1982), in which we held that an instruction which told the jury that "Valium, also known as diazepam, is a controlled sub-

stance" was an impermissible comment on the evidence because only diazepam is listed in RCW 69.50 as a controlled substance. We are satisfied that RCW 69.50.206 describes cocaine as a controlled substance. For this reason, we find *State v. Barringer* unpersuasive and decline to follow it.

Judgment affirmed.

WILLIAMS and RINGOLD, JJ., concur.

Reconsideration denied September 4, 1986.