Filed 10/20/14  P. v. Lora CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PAULINO VALDIVIA LORA,<br><br>    Defendant and Appellant. | G049939<br><br>(Super. Ct. No. INF1101881)<br><br>ORDER GRANTING REQUEST FOR MODIFICATION OF OPINION; NO CHANGE IN JUDGMENT |

Appellant's request to modify our opinion filed on September 22, 2014, is GRANTED.

It is ordered that the opinion filed herein on September 22, 2014, be modified as follows:  On page 2, in the first paragraph, at the end of the last sentence beginning "The trial court sentenced," delete the phrase "without the possibility of parole," so the sentence now reads:

> The trial court sentenced Lora to a term of 82
>
> years to life in prison.

This modification does not effect a change in the judgment.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049939 |
| v. | (Super. Ct. No. INF1101881) |
| PAULINO VALDIVIA LORA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Ronald L. Johnson, Judge.  (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

R. Clayton Seaman, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent

\*          \*          \*

# I.

## INTRODUCTION

A jury convicted Paulino Valdivia Lora of the first degree murder of Alfredo Stultz (Pen. Code, §§ 187, subd. (a), 189; count 1) and the premeditated attempted murder of Julian Sanchez (*id.*, §§ 187, subd. (a), 189, 664; count 2). The jury found true allegations with respect to both counts that Lora personally and intentionally discharged a firearm causing great bodily injury or death (*id.*, §§ 12022.53, subd. (d), 1192.7, subd. (c)(8)), and personally used a firearm (*id.*, §§ 12022.5, subd. (a), 1192.7, subd. (c)(8)). With respect to count 2, the jury found true allegations that Lora personally inflicted great bodily injury on Sanchez. (*Id.*, §§ 12022.7, subd. (a), 1192.7, subd. (c)(8)). The trial court sentenced Lora to a term of 82 years to life in prison without the possibility of parole.

The issue presented is whether the trial court erred by denying Lora's motion to disclose the identity of a confidential informant. Lora contends disclosure was required under Evidence Code section 1041 because the informant would have provided exculpatory evidence that Lora acted in self-defense. We conclude the trial court did not err by denying Lora's motion to disclose the identity of the confidential informant, and therefore affirm.

# II.

## FACTS

A. *Summary*

During the evening of August 2, 2011, several members of the West Drive criminal street gang were hanging out on the lawn of the Country Hills apartment complex in Desert Hot Springs. Among those gathered were Stultz, who was a West Drive gang member, and Sanchez, who was a member of a gang in Imperial County. At

2

some time during the evening, Lora approached the group and asked if anyone had seen his lost dog. Lora also asked Sanchez where he was from, and Sanchez replied, "Calecia." Lora identified himself as "Sur Trece." Nobody had seen the dog, and Lora departed.

Stultz and Sanchez followed Lora. Moments later, witnesses heard several gunshots. Lora had shot Stultz three times, twice from behind and a third time while Stultz lay on the ground. Lora had shot Sanchez four times, and some of the shots had been fired while Sanchez lay on his right side on the ground. Sanchez survived, but Stultz died from his gunshot wounds. A loaded pistol was found underneath Stultz's body.

The parties stipulated: "As a teenager . . . Lora joined the Palm Springs street gang Varrio Palmas gang. In 2006 he was charged with the killing of Sergio Campa, another gang member. At his trial [Lora] testified about the gang and the Mexican Mafia as well as testifying that he killed Mr. Campa in self-defense. Mr. Lora was acquitted by the jury of all charges."

B. *Crime Scene Investigation*

On August 2, 2011 at 11:18 p.m., Desert Hot Springs Police Officer Philip Weigle was dispatched to a shooting at the Country Hills apartment complex. When he arrived, several people directed him to Stultz, who was lying on his back on the east side of building 10. Two women appeared to be performing cardiopulmonary resuscitation on him. Weigle knew Stultz to be a member of the West Drive criminal street gang.

Weigle saw a large amount of blood coming out of a bullet hole in Stultz's chest. In the midst of a "chaotic" scene, Weigle checked Stultz's vital signs. Stultz was not breathing, and Weigle could not detect a pulse. On the sidewalk just east of Stultz was a large trail of blood. Two types of shell casings, .45 caliber and nine millimeter, were scattered around the general area. The wooden handle of a .32-caliber gun was

3

sticking out from under Stultz's back, in the area between his right arm and his torso. Weigle seized the gun, removed the fully loaded magazine, pulled the slide back, and determined no round of ammunition was chambered. The bullets inside the gun were .32 caliber.

A man ran to Weigle and told him, "there is another guy around the corner who is also shot." The other victim was Sanchez. Paramedics arrived and transported Stultz and Sanchez to the hospital. Stultz died, while Sanchez survived but was in critical condition.

## C. *Physical Evidence*

Mark McCormick, a forensic pathologist for the Riverside County coroner's office, performed the autopsy of Stultz. McCormick testified Stultz had suffered three gunshot wounds. First, he had a graze wound on the back of his left forearm. The bullet traveled from his elbow toward his wrist and was consistent with having been inflicted from behind. A second bullet entered the back of his left hip. It had an upward trajectory, which was consistent with Stultz having been shot from behind by someone who was further down a hill. That bullet (a .45-caliber bullet with a fully coppered jacket) had been recovered near Stultz's navel.

A third bullet entered Stultz's chest, inward from his right nipple. That bullet passed through the rib cage, the middle lobe of the right lung, the right atrium of his heart, the lower lobe of his left lung, the descending thoracic aorta, and the back of his rib cage before exiting at the left side of his back. The exit puncture of the third bullet was consistent with Stultz having fallen after receiving the bullet in the hip and with having been shot in the chest while on the ground. The chest wound was fatal.

A toxicology study determined Stultz had had an ethyl alcohol level of 0.07 percent and detected the presence of cannabinoids. McCormick testified alcohol and

4

marijuana are central nervous system depressants and, in general, the combination of the two would have had a calming effect on the physiology and behavior of the user.

Investigator Terry Sherman went to the crime scene, where he collected eight .45-caliber shell casings, five nine-millimeter shell casings, and one spent bullet jacket. A resident of the apartment complex found a .45-caliber shell casing in a grassy area directly in front of his unit.

Criminalist Michele Nichols examined ten .45-caliber cartridge casings and five nine-millimeter Luger cartridge casings recovered from the apartment complex. She determined that all 10 of the .45-caliber casings were fired from a single Glock pistol, but could not determine whether the five Luger casings were fired from a single gun. In her opinion, at least four of the five Luger casings were once held in the same magazine.

Daniel Gregonis, a senior criminalist with the Department of Justice, testified he received six blood samples taken from different locations along the blood trail leading to, and continuing past, Stultz's body. All six matched Sanchez's DNA profile.

D. *Witness Testimony*

Sylvia Nuno testified that in the evening on August 2, 2011, she and Sanchez walked to the Country Hills apartment complex to get some marijuana. Stultz arrived about 10 minutes later. A group of people was "hanging out" at the apartment complex, and some had been drinking beer. At some point, a bald man wearing a black Oakland Raiders jersey walked up and said he was looking for his dog. Nuno was not sure if the man was Lora. Police officers had shown her a photographic lineup and asked her to circle the photograph of the man who was looking for his dog. Although the testimony is somewhat unclear, it appears she circled Lora's photograph.

Nuno testified the man looking for his dog seemed angry. The man asked Sanchez where he was from. Sanchez said he was from Calexico and asked, "[w]here are you from?" The man responded, "Sur Trece," and walked away with a "fat" Hispanic

5

girl.[1] Sanchez was not angry, but it appeared to Nuno he was dumbfounded about what had happened. Nuno did not see anyone shake hands and did not remember seeing a little boy with the man. In a police interview, Nuno had stated that when the man looking for his dog approached, all the men in the area stood up, and Sanchez started "getting crazy."

A few minutes later, Sanchez and Stultz walked off in the same direction in which the man had gone. Neither Sanchez nor Stultz appeared angry. Soon thereafter, Nuno heard gunshots. As Nuno started to leave, she saw Sanchez, who was "full of blood," running toward her. Sanchez told Nuno he had been shot, then dropped to the ground. She grabbed Sanchez's cell phone out of his pocket and dialed 911. She testified she did not see Sanchez with a gun that day.

Rachel Martinez testified that on August 2, 2011, she was at the apartment complex in Desert Hot Springs visiting a friend. At some point, Sanchez arrived with Nuno, and, eventually, Stultz arrived too. A man wearing an Oakland Raiders jersey stopped by with a woman and a toddler. They introduced themselves, and the man in the jersey said he was looking for his dog. He did not seem angry and Martinez thought she saw everyone shake hands. About five minutes later, the man left. No one appeared angry. Sanchez and Stultz talked for a bit, and then wandered off in the direction in which the man looking for his dog had gone. Martinez next heard about 13 gunshots.

Juan Rodriguez testified that in August 2011, he was living in the Country Hills Apartments next door to either Lora or his mother. At around 11:00 p.m. on August 2, 2011, he heard two sets of gunshots. One set was louder than the other, as though each set of gunshots had been fired by a different caliber firearm. Just after hearing the gunshots, Rodriguez looked out of his apartment window and saw Lora running toward the street while holding what appeared to be a dark-colored semiautomatic gun in his hand. He was wearing black shorts, a black Oakland Raiders

---

[1] At that time, Lora's wife was pregnant.

6

jersey, and gloves. Another man wearing a light blue polo shirt and white shoes was running behind him.

Matt Wallace testified that in August 2011, he was living in the Country Hills Apartments with his wife and two children. On August 2, 2011, he heard some gunshots. After the first set of shots ceased and there was silence, he looked out his window and saw a man, later identified as Lora, fire about five shots at someone lying on the ground in a fetal position. Wallace did not see anyone else outside at the time. After another period of silence, Wallace stepped outside and saw people run up to the bushes in front of his apartment. Wallace noticed that somebody was lying in front of the bushes. A woman was smacking that person's face and yelling, "Peanut, wake up." One of the people running up to the bushes was a man holding a Glock nine-millimeter semiautomatic handgun with the slide locked back. Two to three minutes later, Wallace heard more gunshots off in the distance.

Wallace's wife (ex-wife at the time of trial) testified that on August 2, 2011, she heard about seven gunshots. A minute or two later, she heard about seven more shots from what sounded like a different location. She tried to administer cardiopulmonary resuscitation to the victim on the ground near her house, but he did not respond.

Sanchez, who testified under a grant of immunity, admitted he was a gang member from Imperial County. On August 2, 2011, he was in Desert Hot Springs visiting his mother and went to the Country Hills Apartments to be tattooed. Stultz, whom Sanchez had known for a long time, was at the apartment complex that evening. At some point, a man came by looking for a dog. Several people introduced themselves and shook hands with the man, and he left. Sanchez claimed the man was by himself. Sanchez did not remember telling a detective that the man was with a woman who was "kind of chunky." According to Sanchez, no one was angry.

7

At some point, Sanchez got shot in his left arm, his back, the left side of his neck, and his left side. When he was shot through the neck and through the side, he was lying on the ground on his right side.

Sanchez at first refused to identify Lora in court. When confronted with the fact that he had previously spoken to police and identified Lora as the shooter, Sanchez claimed that he only did so because he was "[m]edicated up." Sanchez explained it would not be safe for him to testify against Lora because, in gang culture, there are consequences for testifying in court. The prosecutor asked Sanchez what it meant to have "paper" on somebody. Sanchez replied, "[i]t's all bad," and "[i]t means bad." He testified that if there were a transcript of him testifying against somebody, or a police report showing that he identified someone who committed a crime, the result would be that he would have a "paper."

Sanchez feigned memory loss regarding statements he had made previously to police. After being confronted with the fact that he probably already had "paper" on him for talking to the police, Sanchez conceded Lora was the man who had approached looking for his dog. He also made a gesture toward Lora in court and said: "He killed my homie. I'm already a snitch." Sanchez also testified he did not see Stultz do anything that would justify being shot.

Desert Hot Springs Police Detective Raul Sandoval testified he spoke with Sanchez on August 10, 2011 in the intensive care unit of Desert Regional Medical Center. Sanchez initially did not want to offer much information. After Sandoval proved to Sanchez that Stultz had died, Sanchez revealed he had gone to the Country Hills Apartments with Nuno to get some marijuana. A man, whom Sanchez later identified from a photographic lineup as Lora, walked up with a short, chubby woman asking about a dog. Sanchez told Sandoval that Lora was wearing an Oakland Raiders jersey and dark-colored shorts or trousers with white socks. Sanchez and Lora exchanged descriptions of their gang alliances and shook hands. Sanchez and Stultz (whom Sanchez

8

referred to as Alfred or "P," which stood for Peanut) then walked around the apartments to talk to Lora. As Sanchez and Stultz walked up to Lora, he pulled out a gun, took a step back, and started shooting. Sanchez denied that he or Stultz was carrying a gun. Sanchez told Sandoval that Stultz was three to five feet away from Lora when Lora started shooting.

Sandoval interviewed Sanchez again on August 25, 2011. A recording of that interview was played for the jury. In the interview, Sanchez stated that he did not have a gun on the night of August 2, 2011. He stated he and his friend went to the apartment complex to get some marijuana. A man walked up, looking for his dog. Sanchez had never seen this man before. The man shot Sanchez first. Sanchez looked over and saw Stultz on the ground. Sanchez ran over to Stultz and told him to get up, but Stultz was dying. Sanchez then jumped a brick wall and found his friend, Nuno.

Lora's son, I.L., testified at trial. He was five years old at the time of the shootings. I.L. testified that on the night of August 2, 2011, he lost his dog and went looking for him. He saw his daddy shoot people who were standing next to each other. I.L. testified both of the other men had guns and the other men took their guns out first. After the shooting, I.L. and his parents drove to Mexico.

Denise Moore, from the department of children's services, interviewed I.L. on August 15, 2011. A video of that interview was played for the jury. During the interview, I.L. stated that on the night of August 2, 2011, he and Lora were looking for their dog and some boys came. One boy (the bald one who did not die) pulled out a gun first. Then, his dad pulled a gun from his pocket. I.L. initially stated the other man had fired first, then his dad then "clocked it" and started shooting. Later, I.L. said his dad was the first person to fire a gun. When I.L. and his mother heard the shots, they ducked.

Later, some guys came to the home of I.L.'s grandmother with guns and started shooting at the house.[2]

The next time I.L. saw his dad was at his dad's brother's house. His dad put on a different shirt and a hat. At some point, Lora's brother took them to Mexico and left them there. Lora threw his gun in the desert in Mexico and had thrown the bullets into the street after cleaning them with a napkin. Lora told I.L. that the reason he shot the other guys was that they had "come up on him and they pulled out a gun."

E. *Lora's Interview*

Eight days after the shooting, Lora was apprehended while crossing back into the United States from Mexico with his wife and son. Lora agreed to speak with the police, and his interview was recorded and played for the jury. During the interview, he denied any involvement in the shooting. During the execution of a search warrant at the home of Lora's brother's house, officers found a picture of Lora wearing a black Oakland Raiders jersey.

F. *Defense Evidence*

Enrique Tira, a licensed private investigator, testified as an expert for the defense. He testified that once a gang member is labeled a "snitch" or a "rat," the gang member is no longer welcome in any gang. Tira explained the term "paperwork" means there is documentation to show "you are a snitch or you've cooperated with law enforcement in one fashion or another." The most common way for paperwork to be created is by the subject testifying in court, "[t]hat in itself creates paperwork, which is the court papers, which is in plain black and white." Tira testified paperwork creates a

---

[2] The parties stipulated that within two hours of the shooting at the Country Hills Apartments on August 2, 2011, two unidentified men approached the home of Lora's parents in Desert Hot Springs and fired gunshots at the front door.

10

"green light" or "target" so that the subject of the paperwork "can be taken care of whether it be just by a beat down, a severe beat down, or even killed." Gangs are very careful not to act "unless there is actual paperwork . . . you can see," such as a trial transcript, minute order, or other public record. In Tira's opinion, paperwork was created on Lora when he testified in a prior case about the Mexican Mafia. Based on a hypothetical mirroring the facts of this case, Tira testified that Sanchez and Stultz were acting on paperwork and intended to seriously hurt or kill Lora.

The transcript of Lora's testimony in the prior trial was not generated by the court reporter until July 12, 2012, nearly a year after the charged offenses in this case occurred. The minute order documenting the fact Lora had testified would not have included the substance of his testimony. According to Tira, paperwork on Lora nonetheless could have been created when he took the stand and testified.

Investigator Ryan Monis of the Riverside County District Attorney's Office stated that Lora's testimony in the prior trial placed Lora in a position in which "he is not going to be looked upon in a positive light" by Varrio Palmas gang members. The person Lora killed was a Varrio Palmas gang member. But, in Monis's opinion, if Lora had paperwork, he never would have approached the West Drive members in an attempt to find his missing dog, and would not have "hit[] up" another gang member (i.e., Sanchez) by asking where he was from. Monis had not seen any evidence that Lora had been "green-lighted for execution." Since 2005, Monis had seen over 20 legitimate "hit lists" from the Riverside County area and had not seen Lora's name or gang moniker on any list.

On August 17, 2011, Monis and another district attorney investigator contacted a confidential informant. The informant told Monis that on the night of the shooting, Stultz had a gun. The informant said Stultz had learned, while in prison, that Lora had "a snitch rap." On the night of the shooting, Lora went looking for his lost dog and "bumped into" Stultz and Sanchez (recently released from prison). Sanchez wanted

11

to "hit . . . up" Lora and question him about "his paperwork." Monis believed the informant accurately provided information the informant knew personally or had learned from others. Monis testified that Stultz had once confronted Lora about the "snitch jacket information," but nothing had happened to him as a consequence.

## III.

### DISCUSSION

A. *Lora's Motion to Discover the Identity of the Confidential Informant*

Before trial commenced, Lora made a motion to discover the identity of the confidential informant. Attached to the motion was a report by Monis, who had talked with the informant. The relevant paragraphs of the report state:

"The Informant indicated that he/she attended Stultz'[s] funeral the previous day with fellow members of the West Drive Locos criminal street gang, which he/she is an active member of. The Informant indicated that during the funeral, other members of the gang, which he/she would not identify, were talking about the shooting that led to Stultz'[s] death. The Informant said that the shooter Paulino 'Psycho' Lora was the shooter and the cops had the right guy in custody. The Informant said Lora who was a friend of various members of West Drive in the past had a 'Snitch' []rap on him, discovered by Stultz a couple of years ago when Stultz was in prison. The Informant said Lora had 'paperwork' on him. The Informant said since Lora was a past friend of many members of West Drive including Stultz, nothing was done other than WDL members not continuing to hang around Lora. The informant said Stultz once confronted Lora [about] the 'paperwork', but nothing serious ever happened with that confrontation.

"Informant said on the night of the shooting, Lora was out looking for his pit bull. The Informant said that Stultz was at the complex with Sanchez who had just gotten out of prison. During that time, Lora apparently bumped into Stultz and Sanchez. Sanchez at some point realized who Lora was and heard about his 'paperwork' and

12

wanted to hit him up and question him about it. Shortly after the confrontation the shooting started and Sanchez was shot first. Lora then shot Stultz who fell to the ground, ultimately killing him.

"I asked the Informant if he was aware who else from West Drive was at the complex at the time of the shooting. The Informant said from what he/she heard it was Eulisez 'Doser' Rodriguez, Robert 'Lil Mono' Parra and Alejandro 'Bandit' Chavez. The Informant said he/she heard that Stultz had a gun, but was not aware if Sanchez had a gun. The Informant said other than Lora shooting at Stultz and Sanchez, he/she was unaware of anyone else shooting a gun.

"The information provided by this informant was due to conversation he/she overheard and he/she was not present at the time of the shooting. Disclosure of this informant's identity would put his or her safety at risk, which could result in serious bodily injury or death from others who disclosed this information to him/her."

Lora's trial counsel argued: "This is a self-defense case against persons who were members of that criminal street gang. So we are requesting discovery of the name of that person. They [*sic*] may or may not talk to us, but we would like the opportunity to talk to that person to discover evidence that would be exculpatory to my client."

The trial court denied the motion because "[t]he informant is not a percipient witness to the incident. The informant is only relating what certain gang members, who[m] he refused to identify, told him about the circumstances of the event. It does amount to speculation. The court can't find that the informant is a material witness on the issue of guilt."

B. *Evidence Code Section 1041 and Standard of Review*

Evidence Code section 1041 permits a public entity to refuse to disclose the identity of an informant who has furnished information in confidence to a law

13

enforcement officer.[3] The prosecution must disclose the identity of an informant who is a material witness or dismiss the charges. (*People v. Lawley* (2002) 27 Cal.4th 102, 159.) "An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that [the informant] could give evidence on the issue of guilt that might exonerate the defendant." (*Ibid.*) The defendant bears the burden of producing some evidence showing the informant might be a material witness (*ibid.*) and this showing "'must rise above the level of *sheer* or *unreasonable* speculation'" to reach "'at least the low plateau of reasonable possibility'" (*People v. Luera* (2001) 86 Cal.App.4th 513, 526). "The defendant must show that the informant was in a position to perceive '"the commission or the immediate antecedents of the alleged crime."'" (*Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1276-1277.)

We review the trial court's ruling on the disclosure of the identity of a confidential informant under the abuse of discretion standard. (*Davis v. Superior Court*, *supra*, 186 Cal.App.4th at p. 1277.)


C. *The Trial Court Did Not Err by Denying Lora's Motion.*

Lora did not meet his burden below of showing there was a reasonable possibility the confidential informant could give exonerating evidence on the issue of guilt. Monis's report showed the informant was not a percipient witness. Instead, the informant's knowledge about the shootings was gained by overhearing statements made

---

[3] As relevant here, Evidence Code section 1041, subdivision (a) provides: "(a) Except as provided in this section, a public entity has a privilege to refuse to disclose the identity of a person who has furnished information as provided in subdivision (b) purporting to disclose a violation of a law of the United States or of this state or of a public entity in this state, and to prevent another from disclosing the person's identity, if the privilege is claimed by a person authorized by the public entity to do so and either of the following apply: [¶] . . . [¶] (2) Disclosure of the identity of the informer is against the public interest because the necessity for preserving the confidentiality of his or her identity outweighs the necessity for disclosure in the interest of justice."

14

at Stultz's funeral.  The report stated, "[t]he information provided by this informant was due to conversation he/she overheard and he/she was not present at the time of the shooting."  Thus, the informant could not have given exonerating evidence because the informant's testimony on the issue of guilt would have been inadmissible hearsay.

Lora posits the confidential informant's testimony would have been admissible as statements against penal interest, but that, at best, is sheer speculation.  Lora also argues disclosure of the informant's identity might have led to the discovery of admissible exculpatory evidence.  But that is not the standard.  The standard is whether there was a reasonable possibility *the confidential informant* could give exonerating evidence.

Lora contends the denial of his motion to reveal the identity of the confidential informant violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  The prosecution has "a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt."  (*California v. Trombetta* (1984) 467 U.S. 479, 485.)  However, under federal law, the government has a privilege to withhold from disclosure the identity of persons who provide information about violations of law to law enforcement officers.  (*Roviaro v. United States* (1957) 353 U.S. 53, 59.)  This privilege gives way "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause."  (*Id.* at pp. 60-61.)  The informant's privilege does not violate the Sixth Amendment or the due process clause of the Fourteenth Amendment to the United States Constitution.  (*McCray v. Illinois* (1967) 386 U.S. 300, 312-313.)

Here, disclosure of the confidential informant's identity would not have been relevant or helpful to Lora's defense, was not essential to a fair determination, and would not have raised a reasonable doubt about Lora's guilt.  As we have explained, the confidential informant was not a percipient witness, was not present when the shootings

15

occurred, and gained his or her information entirely by overhearing conversations at Stultz's funeral. Thus, the confidential informant could not have offered admissible evidence on the issue of guilt. Through Monis's testimony, the jury was told about the confidential informant and the contents of the report. The prosecution did nothing to prevent Lora's trial counsel from conducting an investigation and speaking to those persons who had attended Stultz's funeral and who might have had relevant and admissible exculpatory testimony. As our explication of the facts and evidence at trial demonstrates, Lora was fully able to present his defense that Stultz and Sanchez set out to attack him because he had "paperwork" and he shot Stultz and Sanchez in self-defense.

## IV.

### DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

16